494

ESTATE OF H. H. TIMKEN, DECEASED, MRS. EDITH K. TIMKEN, CO-EXECUTRIX, AND W. ROBERT TIMKEN AND HENRY H. TIMKEN, JR., CO-EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 107603.    Promulgated August 11, 1942.

*John G. Ketterer, Esq., Luther Day, Esq.,* and *Louis C. Weiss, C. P. A.,* for the petitioners.

*DeWitt M. Evans, Esq.,* and *Thomas F. Callahan, Esq.,* for the respondent.

SMITH: This proceeding is for the redetermination of deficiencies in income tax against the decedent, H. H. Timken, as follows:

| | |
|---|---|
| 1935 | $523,787.26 |
| 1936 | 129,414.99 |
| 1937 | 532,503.76 |
| Total | 1,185,706.01 |

The issues presented are:

(1) Did the respondent properly disallow any cost basis for 38,215 shares of common stock of the Timken-Detroit Axle Co. sold by the decedent during the year 1935, which shares were received as a property dividend in 1914 but were not reported by him as taxable income of that year?

(2) Did the exchange by the decedent in 1936 of convertible trust bonds of the Chesapeake Corporation for stock of the Chesapeake & Ohio Railway Co. result in the receipt of taxable income measured by the difference between the fair market value of the shares of stock received and the cost of the bonds?

(3) (a) In 1935 decedent made a gift to the Timken Foundation of Canton of all of his interest in an indebtedness owed to him by his brother. The indebtedness was paid in 1937 with shares of stock given to the brother by the decedent for that purpose. Query: Did the decedent realize any taxable income either in 1935, when the gift to the Foundation was made, or in 1937, when the debt was paid?

(b) In 1935 decedent made a gift to the Timken Foundation of Canton of his interest in a note executed by his brother and evidencing a loan which decedent and his two sisters had made to the brother. Interest which had accrued on the note at the time of the gift was paid by the brother in 1936 and 1937. Query: Did the decedent realize taxable income to the extent that the accrued interest was paid, either in 1935, when the gift was made, or in 1936 and 1937, when the interest was paid?

4. Did the receipt of dividends by the decedent from the Imperial Investment Co. in 1937 constitute taxable income of the decedent in an amount in excess of his pro rata share of the earnings of that company?

Petitioners are the executors of the estate of H. H. Timken, who died on October 14, 1940, a resident of Stark County, Ohio. The decedent's tax returns for the years involved were made on the cash basis and were filed with the collector of internal revenue at Cleveland.

The facts have all been stipulated, and as stipulated are adopted as our findings of fact. The issues presented will be considered in order.

## I.

### *Gain or Loss From Sale of Timken-Detroit Axle Co. Stock.*

FACTS.—On or about July 1, 1914, the decedent owned a substantial stock interest in the Timken Roller Bearing Co. (hereinafter called Roller Bearing Co.), which company was then the owner of stock of the Timken-Detroit Axle Co. (hereinafter called the Axle Co.), a corporation which had been organized in 1909. The Roller Bearing Co. acquired its stock in the Axle Co. prior to March 1, 1913. Its investment therein "did not represent an investment of earnings or profits of The Timken Roller Bearing Company accumulated after March 1, 1913."

On or about July 1, 1914, the Roller Bearing Co. declared a dividend payable in stock of the Axle Co. The decedent, as owner of 653 shares of the Roller Bearing Co. stock, received 6,268 shares of the common stock (par value of $100 per share) of the Axle Co.

In 1919 the Axle Co. stock was split ten for one, and in 1922 the Axle Co. paid a stock dividend of 150 percent, as the result of which the decedent's holdings of Axle Co. stock were increased to 156,700 shares. During 1935 the decedent sold 38,215 of those shares for $267,572.50.

The 6,268 shares of Axle Co. stock received by the decedent on or about July 1, 1914, had a fair market value on that date of $283.46 per share (total $1,776,727.28), which was also their fair market value on March 1, 1913. By dividing this value of $283.46 per share by 25, the number of shares into which each dividend share was ultimately divided, the 38,215 shares sold by the decedent during 1935 had a value on or about July 1, 1914, of $11.34 a share or a total of $433,358.10.

Upon receipt in 1914 of the dividend of 6,268 shares of Axle Co. stock an entry was made on the decedent's books crediting the par value of the shares, viz., $626,800, to his investment account in the stock of the Roller Bearing Co. and charging a like amount to a new account representing the investment of the decedent in the Axle Co. No portion of the property dividend was taken into income on the decedent's books.

The question whether the decedent should return as income for the year 1914 all or any part of the value of the stock of the Axle Co. received by him as a dividend during that year was submitted to his counsel for opinion and counsel answered in the negative. Relying upon such advice and that of public accountants, the decedent did not include in his income tax return for 1914 the receipt of the Axle Co. stock.

Continuously for many years prior to 1914, and thereafter, the Roller Bearing Co. kept complete books of account, which have been regularly audited by independent accountants and examined from time to time by representatives of the respondent. Examinations for the year 1914 were made in 1916 and 1917. The books showed the details of the dividend paid in shares of stock of the Axle Co. and the distribution of such stock to the then stockholders of Roller Bearing Co.

The decedent sold 38,215 shares of the Axle Co. stock in 1935 and in his income tax return for that year reported a loss of $49,735.68. The claimed loss represented 30 percent of the difference between a computed cost of $433,358.10 (38,215 x $11.34) and the sale price of $267,572.50. On audit of the decedent's return the respondent disallowed the deduction of the claimed loss and held that the entire proceeds of the sale, $267,572.50, constituted taxable income and that the decedent was liable to income tax upon 30 percent thereof, or $80,271.75.

OPINION.—The question presented by this issue is the correct basis for the computation of gain or loss on the sale by the decedent in 1935 of the 38,215 shares of Axle Co. stock. The petitioners contend that the basis is the fair market value of those shares at the date of receipt in 1914, viz., $11.34 per share, or a total of $433,358.10. The respondent contends that the basis is zero and that the total proceeds of the sale, $267,572.50, constitute gain, 30 percent of which is includable in the decedent's gross income.

The pertinent provisions of the Revenue Act of 1934 are as follows:

SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113 (b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

*        *        *        *        *        *        *

498

(b) **ADJUSTED BASIS.**—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

None of the exceptions contained in subdivision (a) or of the provisions for the adjustment of the basis contained in subdivision (b) are applicable in this proceeding.

In the notice of deficiency which forms the basis for this proceeding it is stated: "The cost basis [Axle Co. stock] is held to be zero since the value of said stock was not returned for Federal income tax when received as a dividend." In his brief the respondent states:

* * * The 1913 Act was applicable in the *Peabody* case; that Act was applicable in 1914 when Mr. Timken received the Axle stock but he did not report receipt of the distribution in any tax return and paid no tax thereon. Yet the taxpayer now seeks the benefit of ascribing a basis of $283.46 (spread over the increased number of shares) the same as if it had been reported and assessed for tax in the year in which it was received. The Axle stock cost him nothing. The Commissioner is correct in ascribing to it a zero basis and taxing the whole of the proceeds, * * *

That the Axle Co. shares received by the decedent in 1914 constituted taxable income to the extent of their fair market value at the date of receipt is conceded by the petitioners upon the authority of *Peabody* v. *Eisner*, 247 U. S. 347. There is no question but that at the time the decedent filed his income tax return for 1914 he honestly believed that the dividend shares received by him did not constitute taxable income. He was so advised by counsel and it was not until the Supreme Court decided the above cited case of *Peabody* v. *Eisner* in 1918 that the question was finally settled. The respondent has not pleaded estoppel in this proceeding, nor does he argue on brief that the petitioners are estopped to make the claim which they now make. His contention is simply that the basis for the computation of gain or loss on the sale of property under the provisions of the Revenue Act of 1934 is "cost"; that the evidence does not show that the decedent ever paid anything in money, property, or services for the Axle Co. shares; and, accordingly, that the net proceeds from the sale of the 38,215 shares in 1935 constitute taxable income.

The commonly accepted meaning of the term "cost" is the amount that a person pays for property acquired. It is defined in Webster's New International Dictionary as follows: "The amount or equivalent paid, or given, or charged, or engaged to be paid or given for anything bought or taken in barter or for services rendered." The term is not defined in the Commissioner's regulations.

The record in this case is absolutely devoid of any proof that the decedent ever paid anything for his Axle Co. shares. Prior to March 1, 1913, he owned shares of stock of the Roller Bearing Co. During 1914 he received a dividend upon those shares which consisted of shares of stock of the Axle Co. The basis for the computation of gain or

loss in respect of any future sale or other disposition of the Roller Bearing Co. shares was not reduced by the payment of the dividend in 1914.

Admittedly the decedent never returned the Axle Co. shares received by him as a dividend as a part of his gross income for any year. Whether the basis prescribed by the statute would be the fair market value of the Axle Co. shares at the date of their receipt in 1914 had the decedent reported them as taxable income in that year we do not need to decide in this case. Presumably the issue would never be before the Board had the decedent so returned them. In *Estate of Edwin D. Metcalf*, 13 B. T. A. 236, the Board said:

> In 1921 the Southern Pacific Co. was the owner of all the capital stock of the Pacific Oil Co. In that year it paid a dividend in the form of a right to purchase stock of the Pacific Oil Co. at the price of $15 per share, which right had a fair market value on the date of its receipt of $18 per share. The value of the rights received by the petitioner should have been returned as an ordinary dividend taxable only at surtax rates. *Peabody* v. *Eisner*, 247 U. S. 347. The subsequent sale or other disposition of the property received by way of a dividend would give rise to gain or loss, dependent upon the amount received therefor. * * *

In *Daisy M. Ward*, 29 B. T. A. 1251, we said at page 1254:

> * * * Assuming further, as petitioners would have us, that the distribution was taxable when made, then upon the subsequent disposition of the stock received thereby the cost basis would be its fair market value when distributed. *Estate of Edwin D. Metcalf*, 13 B. T. A. 236; affd., 32 Fed. (2d) 192. * * *

The petitioners argue that, since the basis for the 38,215 shares of Axle Co. stock would be the amount they claim had the decedent returned the shares for taxation in 1914, and, since the failure to return them for taxation was due to an error in the interpretation of the law, the decedent is entitled to the basis of the fair market value of the shares at the date of receipt. We do not think, however, that this squares with the plain terms of the statute. Absent any proof of cost of the shares to the decedent, it must be held that the total proceeds from the sale of the dividend shares constituted taxable income of the decedent. Cf. *William Merriam Crane*, 27 B. T. A. 360; affd. (C. C. A., 1st Cir.), 68 Fed. (2d) 640; *Orange Securities Co.*, 45 B. T. A. 24; *Greenwood Packing Plant*, 46 B. T. A. 430.

## II.

*Taxability of Gain from Exchange of Chesapeake Corporation Bonds for Chesapeake & Ohio Railway Co. Common Stock.*

FACTS.—During 1933 the decedent acquired $142,000 par value of 20-year 5 percent convertible collateral trust bonds of the Chesapeake Corporation at a cost of $134,190. The bonds were issued pursuant to a collateral trust indenture between the Chesapeake Corporation

and the Guaranty Trust Co. of New York, trustee, dated May 15, 1927, securing $48,000,000 of the bonds. The trust indenture gave bondholders the right to convert such bonds into shares of common stock of the Chesapeake & Ohio Railway Co. of the par value of $100 per share or other collateral substituted for such common stock as a result of consolidation, merger, or readjustment of property of the Chesapeake & Ohio Railway Co. at a conversion price determined as provided in the indenture.

During 1936 the decedent elected to surrender his bonds and received therefor 3,229.47 shares of the common stock of the Chesapeake & Ohio Railway Co., which stock the decedent continued to own throughout the remainder of 1936.

The fair market value of the 3,229.47 shares of stock of the Chesapeake & Ohio Railway Co. at the time of its receipt by the decedent in 1936 was $242,684.93. The decedent did not report any profit upon the transaction in his 1936 income tax return, on the theory that he had not realized taxable income. The respondent determined that the conversion of the bonds of the Chesapeake Corporation into the stock of the Chesapeake & Ohio Railway Co. constituted a taxable exchange and computed the taxable profit as follows:

| | |
|---|---:|
| Fair market value of C. & O. Ry. Co. stock | $242,684.93 |
| Cost of bonds of Chesapeake Corporation | 134,190.00 |
| Gain | 108,494.93 |
| 60% of gain equals | 65,096.96 |

OPINION.—The only question presented by this issue is whether the decedent realized taxable income from the conversion of bonds of the Chesapeake Corporation into common stock of the Chesapeake & Ohio Railway Co. in 1936.

Section 112 (a) of the Revenue Act of 1936 provides:

(a) GENERAL RULE.—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

Thereafter follow specific instances of nontaxable transactions.

The petitioners contend that there was no "exchange" of the bonds of the Chesapeake Corporation for shares of stock of the Chesapeake & Ohio Railway Co., within the meaning of that term as defined in the revenue act; that in order to have an exchange there must be a mutual contract arrangement entered into at the time the exchange is made. They further submit that:

* * * the original contract made at the time of the purchase of the bonds of the Chesapeake Corporation carried with it conversion rights, complete in themselves, to the point that no further action of any sort was required or contemplated by or on behalf of the Chesapeake Corporation. At the time of the purchase of the bonds by the taxpayer, the parties had undertaken to evaluate the

interest which the taxpayer had in the bonds of the Chesapeake Corporation in terms of shares of stock of the Railway Company * * *

In article 1563 of Regulations 45, promulgated under the Revenue Act of 1918, it is provided under the title, "Exchange of property", as follows:

* * * Gain or loss arising from the acquisition and subsequent disposition of property is realized when as the result of a transaction between the owner and another person the property is converted into cash or into property (a) that is essentially different from the property disposed of, and (b) that has a market value. In other words, both (a) a change in substance and not merely in form, and (b) a change into the equivalent of cash, are required to complete or close a transaction from which income may be realized. By way of illustration, if a man owning ten shares of listed stock exchanges his stock certificate for a voting trust certificate, no income is realized, because the conversion is merely in form; or if he exchanges his stock for stock in a small, closely held corporation, no income is realized if the new stock has no market value, although the conversion is more than formal; but if he exchanges his stock for a Liberty bond, income may be realized, because the conversion is into independent property having a market value. * * * Where the owner of a bond exercises the right, provided for in the bond, of converting the bond into stock in the obligor corporation, such transaction does not result in a realization of profit or loss, the transaction not being closed for purposes of income taxation until such stock is sold.

This article has been dropped from regulations prescribed by the Commissioner, with the approval of the Secretary, under later revenue acts. But it has been held by the Chief Counsel of the Bureau of Internal Revenue, in G. C. M. 18436, Cumulative Bulletin 1937–1, p. 101, that the rule stated in article 1563 of Regulations 45 is equally applicable under all subsequent revenue acts, including the Revenue Act of 1936.

*Rose* v. *Trust Co. of Georgia* (C. C. A., 5th Cir.), 77 Fed. (2d) 355, is a case closely in point. In that case the International Corporation owned a majority of the stock of the Coca-Cola Co. It decided to reduce its own capital stock and permit the exchange of one share of its stock for two shares of the Coca-Cola Co. stock which it held. A stockholder of the International Corporation exchanged some of his stock for stock of the Coca-Cola Co. and subsequently sold 100 shares of the Coca-Cola Co. stock at an advance over the basis of exchange. The Commissioner held that taxable gain from the sale was subject to surtaxes. The Circuit Court of Appeals stated in its opinion:

In the cases of *Bancker* v. *Commissioner*, 76 F. (2d) 1 and *Prescott* v. *Commissioner*, 76 F. (2d) 3, both decided March 12, 1935, we affirmed the rulings of the Commissioner as to other exchange transactions of the two stocks, similar to his determination in this case. * * *

* * * However, appellee seeks to distinguish those cases on the ground that in the *Bancker* Case the taxpayer had no right to demand an exchange of stock and in the *Prescott* Case the right of conversion was not granted to the taxpayer until after she acquired the International stock. * * *

\* \* \* There is no practical difference between the questions decided in the *Bancker* and *Prescott* Cases and those involved in this case. \* \* \*

Much the same question as was presented here was before the Board in the case of *Du Bois Young*, 34 B. T. A. 648. The issue there was whether the taxpayer was entitled to deduct a loss sustained by him from a surrender of shares in a trust for securities of the trust. In our opinion we stated:

\* \* \* The petitioner contends that the trust shares were essentially different property from the corporate assets which gave them value, and that by turning them in for assets in the fund he exchanged property at a loss which must be recognized as deductible under the Revenue Act of 1932, section 112 (a). This seems to us to be inescapable, *Allen* v. *Commissioner*, 49 Fed. (2d) 716; certiorari denied, 284 U. S. 655; *Bancker* v. *Commissioner*, 76 Fed. (2d) 1; certiorari denied, 296 U. S. 603; *Prescott* v. *Commissioner*, 76 Fed. (2d) 3. \* \* \* Although the organization called Trust Shares of America appears to be a trust, it is in our opinion not essential to the present decision to call it by a definitive name. It is sufficient if it be separate from the petitioner so that his ownership of an interest in the fund is different from the ownership by the organization of the fund itself. The evidence, as shown by the findings, clearly indicates such a difference in ownership as would insulate the petitioner from direct taxation upon the gains and income of the organization, \* \* \*

Likewise, in the instant proceeding, the convertible bond of the Chesapeake Corporation was an entirely different security from shares of stock of the Chesapeake & Ohio Railway Co. If the decedent had surrendered his convertible bonds and received cash in payment therefor, it can not be doubted that he would be taxable upon any excess of the amount of cash received over the cost of the bonds to him. There can be no difference whether the payment was in cash or in the form of securities of another corporation which had a readily realizable market value. The transaction by which the decedent surrendered his convertible bonds for shares of stock of the railway company was an exchange within the meaning of section 112 (a) of the Revenue Act of 1936, according to all judicial authority. Respondent did not err in his determination that the decedent was liable to income tax upon the excess of the fair market value of the railway company shares received over the cost of the convertible bonds.

## III.

### *Interest on Loans to W. R. Timken.*

FACTS.—(a) On January 16, 1931, the decedent entered into a contract with his brother, W. R. Timken, for a reciprocal loan of securities. The decedent loaned his brother United States First Liberty Loan 3½ percent bonds of an aggregate market value of $5,000,000 and received from his brother 125,000 shares of stock of the Roller Bearing Co. having an equal market value. Each had the right to sell or to

convert to his own use the securities loaned to him and both obligated themselves to return, upon demand, securities of a like kind and amount.

The loan agreement of January 16, 1931, was extended from time to time and was modified as to the quantity of securities involved on several occasions. The original loan agreement, as modified, and extended, continued in existence until some time in June 1935. On June 15, 1935, the Treasury Department called the entire issue of First Liberty Loan bonds for redemption and it would thereafter have been impossible for W. R. Timken to meet any demand of the decedent for the return of the bonds loaned to him pursuant to the terms of the agreement. At the date of redemption W. R. Timken held $3,993,000 principal amount of the bonds and the decedent held 92,000 shares of Roller Bearing stock pursuant to the terms of the reciprocal agreement then in effect.

The original loan agreement of January 16, 1931, provided in part as follows:

2. * * * WRT [W. R. Timken] agrees that unless dividends at $3 per share per annum are paid on said stock [Roller Bearing Co. stock] up to the time WRT may call for re-delivery thereof as hereinafter provided he will pay to HHT [decedent] an amount covering any such deficiency in dividend up to $3 per share per annum. * * *

In September 1931 the dividends paid by the Roller Bearing Co. dropped below an annual rate of $3 per share and W. R. Timken made good the difference until June 1932, when he defaulted in making required payments and such defaults continued until June 28, 1935, when the total aggregated $668,525.

On June 28, 1935, the decedent and W. R. Timken entered into an agreement canceling the original agreement of January 16, 1931. After certain "Whereas" clauses the cancellation agreement reads as follows:

Now, Therefore, the parties agree:

1—The parties hereby release and cancel in their entirety the obligation of WRT to deliver to HHT said $3,993,000 principal amount of 3½% United States Government bonds and the obligation of HHT to deliver to WRT said 92,000 shares of capital stock of The Timken Roller Bearing Company, being all of the said bonds and shares which are not subject to call pursuant to the terms of the Existing Agreement.

2—Contemporaneous with the execution hereof WRT shall execute and deliver to HHT a demand collateral promissory note of even date herewith, payable to the order of HHT in the face amount of $3,166,113.37 and providing for the payment of interest at the rate of 4% per annum, payable semi-annually until the entire principal sum is paid. The said promissory note shall be secured by the pledge of (a) 77,000 shares of capital stock of The Timken Roller Bearing Company (a part of the 92,000 shares above mentioned), 108 shares of capital stock of Timken Investment Company, 321.3 shares of 7% Preferred Stock of the York Ice Machinery Corporation, 10 shares of preferred stock and 1,944 shares of common stock of Triplex Safety Glass Company of North

America; and (b) all the right, title and interest of WRT in and to the corporate securities set forth in Schedule 1 hereto, subject to the existing and prior pledge of said securities for the payment of obligations owing by WRT to The Chase National Bank of the City of New York, Guaranty Trust Company of New York, Cora T. Burnett and Henry H. Timken as Trustee.

3—The Existing Agreement hereby is cancelled and annulled; provided, however, that the said cancellation shall not affect the obligation of WRT, which WRT hereby acknowledges, to pay to HHT upon demand the indebtedness of $668,525 referred to in the second recital hereto, which obligation shall hereafter be unsecured and continue in full force and effect.

EXECUTED at the places and on the dates disclosed below.

| | | |
|---|---|---|
| Canton, Ohio, June 29, 1935. | (Signed) | *Henry H. Timken* |
| | | HENRY H. TIMKEN |
| New York, N. Y., June 28, 1935. | (Signed) | *William R. Timken* |
| | | WILLIAM R. TIMKEN |

SCHEDULE I

195,931 shares of capital stock of The Timken Roller Bearing Company
13,455 shares of capital stock of Timken Detroit Axle Company
180–219/600 shares of common stock of Electric Bond & Share Company
24 shares of capital stock of Detroit Bankers
456 shares of capital stock of Libby-Owens-Ford Glass Company
1,140 shares of capital stock of Louisiana Land & Exploration Company
4,104 shares of common stock of Triplex Safety Glass Company
23 shares of preferred stock of Triplex Safety Glass Company
570 shares of common stock of Alleghany Corporation
746 shares of capital stock of First National Bank of Canton
673–3/10 shares of preferred stock of York Ice Machinery Corporation
228 shares of capital stock of Timken Investment Company
570 shares of common stock of Atlas Corporation

On July 1, 1935, the decedent executed and delivered a deed of gift in favor of the Timken Foundation of Canton under which he irrevocably conveyed to the Foundation all his right, title and interest in and to his claim against W. R. Timken in the amount of $668,525. The claim so assigned to the Foundation represented a past due obligation of W. R. Timken to the decedent and the primary contract out of which it arose was terminated by the cancellation agreement.

The Timken Foundation of Canton to which the claim was assigned is a nonprofit corporation organized on December 28, 1934, under the laws of Ohio and is operated exclusively for charitable purposes. It had three trustees in 1935, who were H. H. Timken, the decedent, A. C. Ernst, and L. C. Weiss. At no time did the decedent receive any financial benefit from the Foundation. The Foundation has been ruled exempt from the payment of Federal income tax.

The deed of gift referred to above provided in part as follows:

II.

It is the understanding of the parties hereto that William R. Timken shall be given every opportunity and the full cooperation of the Foundation to work out

his financial affairs. Accordingly the Foundation, by accepting this gift, agrees as follows:

1—Unless such action would in the opinion of a majority of its Trustees prejudice the right of the Foundation to ultimate payment of the said indebtedness, the Foundation agrees, at the request of William R. Timken, from time to time, to extend or consent to the extension of the time of payment of said indebtedness on such terms and conditions as the Trustees of the Foundation, acting by a majority in their discretion decide.

2—Unless the Trustees of the Foundation, acting through a majority, decide that such action is necessary to protect the rights of the Foundation to ultimate payment, the Foundation agrees not to institute any legal proceedings to enforce the payment of said indebtedness, or any interest thereon, during the period for which these conditions shall be effective.

3—Nothing herein contained shall prevent the Foundation, and it is hereby authorized, with the approval of a majority of its Trustees, to fund the said indebtedness by the acceptance of a note or notes therefor, bearing interest at any rate not exceeding four per cent (4%) per annum or non-interest bearing, or to compromise said indebtedness, in whole or in part either as to principal, interest or other payment, all as said Trustees may determine.

The agreements hereinabove stated in this Item II imposed upon the Foundation shall expire upon the happening of either of the following events:

(a) The death of William R. Timken and the lapse of a reasonable time thereafter, said reasonable time to be determined solely by the Foundation acting through a majority of its Trustees.

(b) A general liquidation of the affairs of William R. Timken occurs or, in the opinion of a majority of the Trustees of the Foundation is imminent, either by reason of an assignment for the benefit of creditors, bankruptcy, either voluntary or involuntary, or any other act or proceeding instituted by creditors, by him or by others.

Neither the Foundation nor its Trustees shall be accountable to the Donor or to any other person for any action of any character which the Foundation or its Trustees may take or omit to take hereunder so long as they are acting in good faith.

Following the assignment of the claim to the Timken Foundation of Canton by the decedent on July 1, 1935, representatives of the Foundation, A. C. Ernst and L. C. Weiss, two of the above named trustees, requested W. R. Timken to execute a promissory note evidencing his indebtedness to the Foundation, and thereupon W. R. Timken executed and delivered to the Foundation his certain promissory note dated July 10, 1935, in the face amount of $668,525. The note reads as follows:

PROMISSORY NOTE

$668,525.00                                    New York, N. Y., July 10, 1935

On demand after date, the undersigned, for value received, promises to pay to the order of TIMKEN FOUNDATION OF CANTON, an Ohio corporation, the sum of Six Hundred Sixty-eight Thousand Five Hundred and Twenty-five Dollars, with interest thereupon at the rate of four per cent (4%) per annum until the entire principal amount hereof has been paid.

(Signed) WILLIAM R. TIMKEN

On June 28, 1935, W. R. Timken was indebted as follows:

| | |
|---|---:|
| Chase National Bank of the City of New York | $1,430,854.78 |
| Cora T. Burnett | 582,545.14 |
| Guaranty Trust Co. of New York | 722,242.63 |
| H. H. Timken | 3,160,113.37 |
| H. H. Timken | 668,525.00 |
| Timken Foundation of Canton | 2,730,678.60 |
| Timken Foundation of Canton | 476,539.87 |
| Total | 9,777,499.39 |

Subsequently, during the remainder of 1935, W. R. Timken paid off the principal of the note for $3,166,113.37 out of the proceeds from the sale of some of the shares of stock of the Roller Bearing Co. which had been deposited with the decedent as collateral. On July 1, 1935, W. R. Timken owned 272,931 shares of stock of the Roller Bearing Co., of which 175,000 had a tax base of $6.35 per share.

Under date of December 31, 1936, the decedent wrote to W. R. Timken, 597 Madison Avenue, Fuller Bldg., New York City, in part as follows:

Dear Will:

I have your letter of December 29th and have learned that the Foundation has received your check for $425,000 in payment of interest. It is my understanding that this payment of interest will make a substantial reduction in the amount of your income tax for the year 1936 and should be very helpful in working out your financial situation.

It is my intention immediately after the first of the year and before I leave for California to make a gift to you of 9,200 shares of Timken stock. At the present market price of $73.00 this will cover the note of $668,000, which you owe to the Foundation. Of course, to whatever extent you sell these shares to repay the money you have borrowed from the bank, you will not have it available for payment on the Foundation note and it is my understanding that you will take whatever additional shares is [sic] necessary from your own holdings and deliver them to the Foundation to pay off the $668,000 note. By delivering Timken stock to the Foundation in payment of this note, you will be able to keep this quantity of stock off of the market and will be given credit for the full market price by the Foundation.

Of course, you will have income tax on the difference between my cost of $6.25 a share and the market price of the stock when you realize this through sale or payment on the loan. Since I have owned the stock for more than ten years, you will be required to report as taxable income not more than 30% of any profit which you realize in this manner.

The $425,000 interest payment mentioned in the above letter refers to interest upon another note of W. R. Timken which had been assigned to the Timken Foundation of Canton, as explained below.

On January 2, 1937, the decedent made a gift to W. R. Timken of 9,200 shares of stock of the Roller Bearing Co., upon which gift the decedent paid a gift tax of $192,628.61. The Roller Bearing Co. stock was quoted on the New York Stock Exchange on January 2, 1937, at a high of 73½, a low of 72, with an average of 72¾. Figured at

an average price of 72¾, the 9,200 shares of stock, the subject of the gift to W. R. Timken, were worth $669,300 (the valuation upon which the gift tax was paid) as compared with the principal of the note held by the Timken Foundation of $668,525.

Pursuant to the understanding between the decedent and his brother, W. R. Timken, on June 22, 1937, transferred the 9,200 gift shares (identified by certificate numbers) of Roller Bearing Co. stock to the Timken Foundation of Canton, receiving a credit therefor against his indebtedness on his note of $662,400.

(b) In 1931 the decedent and his two sisters loaned to W. R. Timken, upon his request, $1,000,000 in cash and securities of a market value of $2,000,000. Thereupon the decedent, as trustee for his sisters and himself, received from W. R. Timken his promissory note dated July 30, 1931, in the face amount of $3,000,000. The loan was made for a period of one year and without interest. W. R. Timken pledged collateral with the decedent as trustee for himself and his sisters for the loan but the value of the collateral was substantially less than the principal amount of the loan. The decedent had a one-third interest in the loan.

The loan was not paid off at maturity but was continued, and on or about July 14, 1933, a certain pledge agreement was entered into by and between W. R. Timken and the decedent, acting both individually and as trustee, by which, among other things, additional property was pledged and mortgaged for the payment of the note of July 30, 1931. This pledge agreement evidences that W. R. Timken was then indebted in the following amounts:

| | |
|---|---:|
| To H. H. Timken (principal amount of 3½% U. S. Government bonds) | $4,287,000.00 |
| To H. H. Timken as trustee | 3,000,000.00 |
| To Chase National Bank | 2,308,169.65 |
| Hornblower & Weeks | 1,052,582.28 |
| Guaranty Trust Co. of New York | 1,155,997.27 |
| Total | 11,803,749.20 |

W. R. Timken paid interest on this loan of $3,000,000 until April 30, 1932 (*sic*). He defaulted in interest payments from then to January 1935. The interest accrued and unpaid on the note as of January 1935, aggregated $476,539.87, one-third of which amount, the decedent's portion thereof, is $158,846.62.

On or about January 24, 1935, the decedent and his two sisters by deed of gift irrevocably conveyed their entire title and interest in and to the loan of July 30, 1931, to the Timken Foundation of Canton, and said note and collateral thereto were then endorsed and delivered to the Foundation. Thereupon the decedent and his sisters ceased to have any pecuniary interest in the loan or the interest

accrued thereon. At the time of the execution of the deed of gift there was a balance of $2,730,678.60 due on the principal.

In December 1936 the Timken Foundation of Canton received from W. R. Timken $397,000 to apply on the accrued interest due upon the loan assigned to the Foundation by the decedent as trustee.

Negotiations between representatives of the Foundation and W. R. Timken for a liquidation of the indebtedness of the latter to the Foundation continued after December 1936, and culminated in an agreement of January 26, 1937, under which the Foundation agreed to accept shares of stock of the Roller Bearing Co. at the quoted market price of $72 in full settlement of its claims against W. R. Timken. By reason of an increase in the prevailing market price of Roller Bearing stock from about $40 a share on July 1, 1935, to $72 a share in January 1937, W. R. Timken was able to procure a release of 43,530 shares of stock of such company from the Guaranty Trust Co. and the Chase National Bank of New York, to which such stock had been pledged as collateral on loans.

The 43,530 shares of stock so procured by W. R. Timken, together with 9,200 shares of stock of the Roller Bearing Co. which were given to W. R. Timken by the decedent on January 2, 1937, at the then market price of the stock were sufficient to satisfy the balance due the Foundation on the loan assigned to it by the decedent as trustee and the amount due the Foundation on W. R. Timken's note of July 10, 1935. Accordingly the Foundation received from W. R. Timken on or about June 22, 1937, 52,730 shares of stock of the Roller Bearing Co., which were applied in full payment of the following claims:

|  |  | *Excess credit* |
|---|---|---|
| Principal of original $3,000,000 triparty loan of July 30, 1931 | $2,730,678.60 |  |
| Interest accrued from May 1, 1932, to Dec. 31, 1936, at 6% per annum $794,304.82 |  |  |
| Less amount paid Dec. 30, 1936 397,000.00 | 397,304.82 |  |
|  | 3,127,983.42 |  |
| Less payment made by delivery on June 22, 1937, of 43,530 shares of Timken Roller Bearing Co. in accordance with settlement agreement dated Jan. 26, 1937 | 3,134,108.42 | $6,125.00 |
| Note dated July 10, 1935, issued to Timken Foundation of Canton | 668,525.00 |  |
| Less payment made by delivery on June 22, 1937, of 9,200 shares of Timken Roller Bearing Co. in accordance with settlement agreement dated Jan. 26, 1937 | 662,400.00 | (6,125.00) |
|  |  | $0.00 |

Designating the loan of January 26, 1931, as extended, as the "individual" loan, and the loan of July 30, 1931, by the decedent as trustee for himself and his two sisters as the "joint" loan, the balance of interest and the payments made were as follows:

1935—Interest defaulted and claim assigned as gifts to Timken Foundation:

| | |
|---|---:|
| Individual | $668, 525. 00 |
| One-third share of joint loan | 158, 846. 62 |
| Total | 827, 371. 62 |

Amounts paid by W. R. Timken Foundation on above claims:

| | | |
|---|---:|---:|
| 1936—One-third share of joint loan | $132, 333. 33 | |
| 1937—On individual loan | 668, 525. 00 | |
| One-third share of joint loan | 26, 513. 29 | |
| Total | | $827, 371. 62 |

The respondent added to the decedent's income for the year 1935 the sum of $827,371.62, which was the amount of the interest due the decedent from W. R. Timken and which had been assigned or given to the Timken Foundation in the manner set forth above. As an alternative, the respondent added to the decedent's income for the year 1936 the sum of $132,333.33 and in the year 1937 the sum of $695,038.29, which were the amounts of interest paid by W. R. Timken to the Timken Foundation which the decedent had assigned or given to the Timken Foundation as described above. The decedent did not return any part of these amounts in his income tax returns for 1935, 1936, and 1937.

Upon the stipulated facts and exhibits the Board makes the following findings of fact:

At the time of the transfers by deed of gift to the Timken Foundation of Canton of the $668,525 indebtedness and of the triparty note it was problematical whether the Foundation would ever be able to collect the $668,525 item or the interest upon the note. Neither of these items was collectible at the date of gift.

OPINION.—The questions presented on this issue are:

(a) Whether decedent is liable to income tax for 1935 upon the amount of $668,525 owed to him by his brother, W. R. Timken, which indebtedness the decedent on July 1, 1935, transferred by deed of gift to the Timken Foundation of Canton; in the alternative, whether the decedent is liable to income tax upon a like amount of income for 1937 when W. R. Timken paid the debt to the Timken Foundation.

(b) Whether the decedent is liable to income tax upon $158,846.62 representing the decedent's portion of the interest due on the note which the decedent as trustee for himself and sisters transferred to

the Timken Foundation of Canton by deed of gift on January 24, 1935; and if not taxable for such interest in 1935, whether he is taxable upon the interest paid in 1936 and 1937 in the respective amounts of $132,333.33 and $26,513.29.

It is the respondent's primary contention that the decedent is liable to income tax for 1935 upon both the $668,525, referred to in (a) above, and the $158,846.62, referred to in (b), or a total of $827,-371.62. If this contention of the respondent is sustained, he admits that the decedent is not liable to income tax upon the payments made by W. R. Timken to the Timken Foundation in 1936 and 1937.

The $668,525 item represents an indebtedness of W. R. Timken to the decedent which arose under the original reciprocal loan agreement of January 16, 1931. Strictly speaking, it did not represent interest on indebtedness, although once referred to as such in the stipulation of facts. The debtor had guaranteed dividends upon Roller Bearing Co. stock held by the decedent at $3 per annum. The annual dividend fell below that figure and the $668,525 represents the deficit in the dividends which W. R. Timken was under obligation to make good.

The item of $158,846.62 represents the decedent's portion of the unpaid interest which had accrued on the past due note of W. R. Timken to the decedent as trustee up to the date of the gift. The respondent does not claim that the decedent is liable to income tax upon any portion of the interest which accrued and was paid upon the note by W. R. Timken after the date of the gift to the Timken Foundation.

We consider first the contention of the respondent that the decedent is liable to income tax for 1935 upon both the $668,525 item and the $158,846.62 item.

The decedent made his income tax returns upon the cash basis. Ordinarily a man on such basis is required to include in gross income only income received in the form of cash or of property having a realizable cash value. *Avery* v. *Commissioner*, 292 U. S. 210. During the year 1935 the decedent made gifts to the Timken Foundation of the $668,525 indebtedness and also of all his interest in the tri-party note and accrued interest thereon. The decedent did not in 1935 receive from the debtor either in the form of cash or of property the items in question. But for the gifts there would be no ground for the respondent's contention that the items in question constituted taxable income of the decedent for 1935. The respondent submits that the gifts constituted a realization of income within the meaning of *Helvering* v. *Horst*, 311 U. S. 112.

The facts in the *Horst* case were that in 1934 and 1935 Horst clipped coupons from certain bonds owned by him shortly prior to the date when they became due and payable and gave them to his

son who collected them within the year of gift. The Board held (39 B. T. A. 757) that Horst, the owner of the bonds, and not the son (who returned the interest for taxation) was liable to income tax upon the amounts collected. This was upon the principle that the owner of property is liable to income tax upon income produced by his property, regardless of who collects the income, and that he may not avoid liability to income tax by assigning his interest in the income to others. The Supreme Court affirmed our decision. In its opinion the Court used the following language:

Although the donor here, by the transfer of the coupons, has precluded any possibility of his collecting them himself he has nevertheless, by his act, procured payment of the interest, as a valuable gift to a member of his family. Such a use of his economic gain, the right to receive income, to procure a satisfaction which can be obtained only by the expenditure of money or property, would seem to be the enjoyment of the income whether the satisfaction is the purchase of goods at the corner grocery, the payment of his debt there, or such non-material satisfactions as may result from the payment of a campaign or community chest contribution, or a gift to his favorite son. Even though he never receives the money he derives money's worth from the disposition of the coupons which he has used as money or money's worth in the procuring of a satisfaction which is procurable only by the expenditure of money or money's worth. The enjoyment of the economic benefit accruing to him by virtue of his acquisition of the coupons is realized as completely as it would have been if he had collected the interest in dollars and expended them for any of the purposes named. *Burnet v. Wells, supra.*

The respondent, relying upon the above quoted language and other language of the opinion, submits that under the doctrine of the case it must be held that the two above referred to items were constructively received by the decedent in 1935.

The first question which presents itself is whether the decedent had in 1935 the satisfactions which would warrant the inclusion of the amounts in the decedent's gross income of that year. Quite clearly in a case such as this it must appear that the donor has "fully enjoyed the benefit of the economic gain represented by his right to receive income" (*Horst* opinion) before the donor can be held liable to income tax upon any part of the gift property. So far as we have been able to determine, neither the Board nor the courts have ever gone so far as to hold that a donor of property was liable to income tax upon any part of the gift property or of the income received thereon prior to the actual collection of the income.

In *Helvering* v. *Eubank*, 311 U. S. 122, the taxpayer, a life insurance agent, in 1924 and 1928 gave to another his right to receive renewal commissions under certain contracts which Eubank had with life insurance companies. In 1933 the assignee received renewal commissions under the contracts. The question before the Court was whether the assignor was liable to income tax for 1933 upon the commissions paid. The respondent did not attempt to hold the assignor liable to income tax in the years 1924 and 1928 upon his gifts of the contracts to another.

The Supreme Court held that the donor was liable to income tax for 1933 upon the renewal commissions received by the assignee under the contracts in that year.

In *Harrison* v. *Schaffner*, 312 U. S. 579, the taxpayer, in December 1929 and in November 1930, assigned specific amounts of trust income to which she was entitled, as a life beneficiary, for years following the respective assignments. The Commissioner ruled that the income was that of the life beneficiary and was taxable to her in the years when paid to her assignees. The Supreme Court upheld the Commissioner's action.

Substantially, the issue now being considered as to the decedent's liability to tax upon the amounts in question in 1935 was before the Board in *Annie A. Colby*, 45 B. T. A. 536. The taxpayer in that case owned a note and mortgage on certain real estate. On December 30, 1935, she assigned the note and mortgage, with all rights to interest, to a trust for the benefit of her children. The accrued but unpaid interest on the mortgage at the date of assignment was in the amount of $24,176.39. The mortgagee paid $18,000 of the accrued interest in 1936 and the balance of $6,176.39 in 1937. The Commissioner had determined that the taxpayer, the assignor, was liable to income tax for 1935 in respect of the interest which had accrued upon the note to December 30, 1935, which had not been collected. The Board held that the interest, not having been collected by anybody in 1935, was not taxable to the assignor for that year.

The instant proceeding does not present a case where the donor, the decedent in this case, had deliberately refused to receive payment of the two items here in question in 1935. The respondent claims that the stipulated facts show that W. R. Timken was in "excellent financial condition" in 1935 and that the decedent could have received payment in that year if he had chosen to do so.

We think that the evidence does not warrant such a finding. Practically all of the decedent's property, including his home, was pledged for the payment of his debts. He had not been able to meet his obligations, either for the deficiency in dividends to the decedent or for the payment of interest upon the tri-party note during 1935 and prior years. It was only through the financial assistance that was given to W. R. Timken by the decedent and his sisters that he was enabled to weather the financial storms which followed 1929. The financial condition of the debtor is indicated by the fact that in the deeds of gift to the Timken Foundation it was specifically provided that the trustees might compromise in any manner that they saw fit the indebtedness of W. R. Timken upon the debts assigned. If the price of the Roller Bearing Co. stock had declined rather than advanced, it is entirely possible that no part of the indebtedness would ever have been col-

lected by the Foundation. The advance in the market price of the stock from about $40 a share in the middle of 1935 to over $70 a share by the close of the year was a lifesaver for the debtor.

From a consideration of all of the evidence, we reach the conclusion that the decedent had no realization of income in 1935 of any part of the $668,525 and $158,846.62 items.

The respondent's alternative contention is that the decedent realized taxable income in 1936 of such portion of the accrued interest on the tri-party note as had accrued at the date of gift in 1935 and was paid by the debtor in 1936; also that he is liable to income tax upon the $668,525 item, and upon the balance of the accrued interest on the tri-party note, both of which were liquidated in 1937 by a transfer to the Foundation of shares of stock of the Roller Bearing Co.

Relative to the first item, it is to be noted that the decedent himself in 1937 gave to his brother, W. R. Timken, 9,200 shares of Timken Roller Bearing Co. stock to enable him to pay his indebtedness of $668,525 to the Foundation. It was these identical shares that were used by W. R. Timken in liquidating the indebtedness. In these circumstances we think that there is no ground for the respondent's contention that the decedent had in 1937 the "economic gain" which would subject him to tax.

Section 22 (b) (3) of the Revenue Act of 1936 provides for the exclusion from gross income of "The value of property acquired by gift, bequest, devise, or inheritance (but the income from such property shall be included in gross income)." In *Rebekah C. Schoonmaker*, 39 B. T. A. 496, the question before the Board was whether the taxpayer, who made an irrevocable transfer to a trust for the benefit of her grandson of certain bonds upon which there was accrued but unmatured interest at the time of transfer, was liable to income tax in the year of gift upon the interest which had accrued upon the bonds but was not then due. We held that the donor had no constructive receipt of the unmatured interest in the year of gift and that she was not liable to income tax thereon. We think that the same rule would apply in a case where a person makes a gift of a note with accrued interest thereon but which was uncollectible at the date of gift or of a bond upon which there was matured but unpaid coupons by reason of a default in interest payments by the obligor. In such case the donee is subrogated to the rights of the donor with respect to the collection of the interest. If by some fortuitous circumstance the debtor becomes able to pay the interest in a later year and pays it, we think that it constitutes income of the donee and not of the donor. A practicable result must be reached in all such cases. If it were to be held that a donor of a note or bond upon which there was accrued but unpaid and uncollectible interest at the date of the gift was liable to income

tax upon the collection of the interest by the donee in a later year, it might happen that the donor would be held liable to income tax in a year after he was dead and his estate settled.

In *Harrison* v. *Schaffner*, *supra*, in 1929 the taxpayer, the life beneficiary of a testamentary trust, assigned to certain of her children specified amounts in dollars from the income of the trust for the year following the assignment. The Court held that she was liable to income tax upon the income which was received in the subsequent year by the assignees. It was pointed out that in *Blair* v. *Commissioner*, 300 U. S. 5, the Court held that where a life beneficiary assigned a portion of her interest in the trust fund the assignee and not the assignor was liable to income tax upon the amounts received by the assignee. The Court stated:

* * * It is true, as respondent argues, that where the beneficiary of a trust had assigned a share of the income to another for life without retaining any form of control over the interest assigned, this Court construed the assignment as a transfer in praesenti to the donee, of a life interest in the corpus of the trust property and held in consequence that the income thereafter paid to the donee was taxable to him and not the donor. *Blair* v. *Commissioner*, *supra*. But we think it quite another matter to say that the beneficiary of a trust who makes a single gift of a sum of money payable out of the income of the trust does not realize income when the gift is effectuated by payment, or that he escapes the tax by attempting to clothe the transaction in the guise of a transfer of trust property rather than the transfer of income where that is its obvious purpose and effect. We think that the gift by a beneficiary of a trust of some part of the income derived from the trust property for the period of a day, a month or a year involves no such substantial disposition of the trust property as to camouflage the reality that he is enjoying the benefit of the income from the trust of which he continues to be the beneficiary, quite as much as he enjoys the benefits of interest or wages which he gives away as in the *Horst* and *Eubank* cases. * * *

We are not dealing here with a gift by the decedent of merely a right to receive income. By the deeds of gift executed in 1935 the decedent transferred all of his right, title, and interest in and to (a) the indebtedness of W. R. Timken to him in the amount of $668,525, and (b) to the tri-party note, with accrued interest thereon. Not only the right to receive the accrued interest was given but also the note that produced it. The parties have stipulated that the Timken Foundation was operated exclusively for charitable purposes and that "At no time has the taxpayer [decedent] received any financial benefit from Timken Foundation of Canton." After the execution of the deeds of gift the decedent had no interest whatever in the gift property. The situation is not like that which obtained in the *Horst* case, for there the donee was the donor's son—one who had a claim upon his bounty. In *Choate* v. *Commissioner* (C. C. A., 2d Cir.), 129 Fed. (2d) 684, the court held that where taxable income

results from the exercise of stock rights the stockholder who received the rights, but gave them to members of his family, who exercised them, is taxable under *Helvering* v. *Horst, supra.* The court observed:

"* * * precisely because the donees are members of his family, under *Helvering* v. *Horst*, 311 U. S. 112 * * * as we have previously interpreted it, the taxable income must be regarded as the donor's." This is upon the theory that "one who retains substantial ownership of the tree is taxable on the fruit thereof, despite his assignment to a donee of the right to pick the fruit." See *Commissioner* v. *Bateman*, 127 Fed. (2d) 266, 273.

It is not necesary for us to decide in the present proceeding, nor do we decide, that in every case the donor will be relieved from income tax upon the income of property which he has given to another prior to the taxable year. Cf. *Helvering* v. *Eubank, supra,* and *Harrison* v. *Schaffner, supra.* But the facts in the instant case show that the interest on the tri-party note which had accrued up to the date of the gift was not collectible by the donor at the time. In view of this fact we think that the collection of the interest by the Foundation in 1936 and 1937 in the form of shares of stock of Roller Bearing Co. in a compromise transaction did not constitute the receipt of taxable income by the decedent.

## IV.

*Taxability of Dividends Received from Imperial Investment Co.*

FACTS.—The Imperial Investment Co. was a corporation organized under the laws of the State of Delaware in 1930. It acquired from the decedent, H. H. Timken, certain of his investments, including shares of stock of the Twin Coach Co. It issued all of its capital stock, consisting of 1,400 shares having a par value of $100 per share, in exchange for the assets received. Later the number of shares outstanding was reduced to 800. At all times during 1936 the decedent owned 300 shares of this stock and the Avalon Investment Corporation owned 500 shares. The stock of Avalon Investment Corporation was owned by Edith K. Timken, wife of the decedent.

The Imperial Investment Co. consistently kept its books on the cash basis and made its income tax returns on the same basis.

On January 1, 1936, the Imperial Investment Co. had no accumulated earnings or profits. Its earnings and profits for 1936, including nontaxable income of $1,601.67 and after deducting expenses and income and excess profits taxes ($7,392.46), as determined by the respondent, amounted to $247,011.94.

During 1936 the Imperial Investment Co. made the following distributions to its shareholders:

| | |
|---|---:|
| July 7, 1936, cash | $200,000.00 |
| July 8, 1936, 12,000 shares stock Twin Coach Co. at cost | 30,857.14 |
| Dec. 8, 1936, cash | 48,000.00 |

The cash distribution of $200,000 on July 7, 1936, and the distribution of 12,000 shares of Twin Coach Co. stock were authorized at a meeting of the board of directors of the Imperial Investment Co. on July 6, 1936. The cash distribution exceeded the accumulated earnings and profits of the company on that date and the company had no undistributed earnings or profits on July 8, 1936, when it distributed the 12,000 shares of Twin Coach Co. stock. As used in this paragraph "accumulated" and "undistributed" earnings or profits are exclusive of any unrealized increments in value of its assets.

The 12,000 shares of stock of Twin Coach Co. distributed as above were acquired by the Imperial Investment Co. immediately after its incorporation on or about April 7, 1930, and this stock, together with certain other securities not here involved, represented the consideration for which the capital stock of the company was initially issued. On July 8, 1936, the 12,000 shares of stock of the Twin Coach Co. had a fair market value of 12⅞ per share, or $154,500. The cost to the company of this stock as entered on its books was $30,857.14. The fair market value of the Twin Coach Co. stock distributed to the decedent was $57,937.50.

At the time of its incorporation the Imperial Investment Co. received property of a value substantially in excess of the par value of its stock in exchange for its stock, and such excess was credited to paid-in surplus.

The Imperial Investment Co. was not in process of liquidation in 1936 and no change in its capital stock was made during that year. The capital stock of the company was not impaired at any time in 1936, since it had a substantial paid-in surplus, representing the value of the property originally contributed to the corporation in excess of the par value of the capital stock issued therefor.

The decedent's share of the cash distributions made by the Imperial Investment Co. in 1936 was $93,000. The decedent credited to dividend income upon his books, and so reported in his 1936 income tax return, an amount of $92,886.61 as representing his share of the 1936 earnings and profits of the Imperial Investment Co. This amount was subsequently changed by the respondent's adjustment to $92,629.48. The remainder of the distributions, including the Twin Coach Co. shares, was taken at fair market value on the date of distribution and was applied by the decedent to reduce his investment in stock of the Imperial Investment Co.

In the determination of the deficiency the respondent has included in dividend income the amount of $133,700.44 from the Imperial Investment Co., computed as follows:

| | |
|---|---:|
| July 7, 1936, Cash | $200,000.00 |
| July 8, 1936, Twin Coach stock (cost) | 30,857.14 |
| Dec. 28, 1936, Cash | 48,000.00 |
| Total | $278,857.14 |
| Earnings available | $247,011.94 |
| Percentage earnings to dividends | 88.58% |

Decedent's share:

| | |
|---|---:|
| July 7, 1936, cash dividend | $93,000.00 |
| July 8, 1936, stock dividend (value 12⅝ sh.) | 57,937.50 |
| | $150,937.50 |
| 88.58% of $150,937.50 equals | $133,700.44 |

OPINION.—The petitioners admit that the decedent is liable to income tax in 1936 upon dividends received from Imperial Investment Co. of $92,629.48. That amount represents $\frac{300}{800}$ of $247,011.94 of the earnings and profits of the Imperial Investment Co. for 1936, which were available for distribution to its stockholders. They contend, however, that the balance of the distributions received from Imperial Investment Co. represented a return to the decedent of his capital investment in the shares of the Imperial Investment Co., and that they merely operated to reduce the basis of his shares.

Section 115 of the Revenue Act of 1936 provides in part as follows:

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this title (except in section 203 (a) (3) and section 207 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

(b) SOURCE OF DISTRIBUTIONS.—For the purposes of this Act every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113.

 *     *     *     *     *     *     *

(j) VALUATION OF DIVIDEND.—If the whole or any part of a dividend is paid to a shareholder in any medium other than money the property received other than money shall be included in gross income at its fair market value at the time as of which it becomes income to the shareholder.

The respondent argues that, inasmuch as the investment of the Imperial Investment Co. in the 12,000 shares of stock of the Twin Coach Co. had increased in value from the date of its acquisition from $30,857.14 to $154,500, the difference between these amounts constitutes earnings of the Imperial Investment Co. This argument is unsound. Clearly, the Imperial Investment Co. had no taxable income from the increase in the value of shares of Twin Coach Co. which it distributed in 1936. See *General Utilities & Operating Co.* v. *Helvering*, 296 U. S. 200.

It is further apparent that of the total distributions made by the Imperial Investment Co. to its stockholders in 1936, only $247,011.94 constituted "dividends" within the meaning of section 115 (a) of the statute. The excess was a distribution of capital. It is clear that under the provisions of section 115 (b) the distributions are to be applied against and reduce the adjusted basis of the stock. The petitioners admit that for that purpose the Twin Coach stock had a fair market value of $154,500. No claim is made by the respondent that these capital distributions received by the decedent in 1936 from the Imperial Investment Co. were in excess of the adjusted basis for the stock. The action of the respondent in including in the decedent's gross income for 1936 more than $92,649.48 of the distributions received from Imperial Investment Co. is reversed.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

LEECH dissents on issue I.

HILL dissents on issue III, (a) and (b).

KERN dissents on issue III(b).

OPPER dissents on issue IV, on authority of *Binzel* v. *Commissioner* (C. C. A., 2d Cir.), 75 Fed. (2d) 989, and *J. E. Timberlake*, 46 B. T. A. 1082.

STERNHAGEN, TURNER, and MELLOTT dissent.