Estate of John H. Acheson, Deceased, Union Trust Company, Successor Trustee, St. Petersburg, Florida, [1] v. Commissioner. Estate of Acheson v. Commissioner
Docket Nos. 2712, 2715, 2723, 2724, 2725, 2726, 2727, 2728, 2729, 2731.
United States Tax Court
1944 Tax Ct. Memo LEXIS 36; 3 T.C.M. (CCH) 1242; T.C.M. (RIA) 44392; November 25, 1944
*36 Paul P. Cohen, Esq., for the petitioners. F. S. Gettle, Esq., for the respondent. STERNHAGEN The Commissioner determined deficiencies in income tax as follows: Estate of John H. Acheson
$ 1,893.68
Margaret M. Acheson
178,312.32
Margaret Acheson Stuart
1,700.93
Howard A. Acheson Trust
15,017.41
Edward G. Acheson Trust
15,017.40
John H. Acheson Trust
15,018.14
Margaret Acheson Stuart Trust
15,015.11
Veronica B. A. Mackey Trust
15,017.74
George W. Acheson Trust
15,018.12
Edward G. Acheson, Jr:h1,592.61
1. All the petitioners assail the determination that the distributions of the Acheson Corporation during 1935 in shares of Acheson Graphite Corporation and cash were taxable to them in their entirety as dividends. All the facts of this issue are stipulated. 2. The petitioner in Docket No. 2715 also assails the disallowance of a bad debt deduction of $143,252.54. The facts of this issue are found from the evidence. Findings of Fact 1. John H. Acheson filed his income tax return for 1935 at Jacksonville, Florida. Margaret M. Acheson, a resident of St. Petersburg, Florida, filed her 1935 income tax return on the cash basis at Jacksonville, Florida. Margaret Acheson *37 Stuart and Edward G. Acheson, Jr., each filed a 1935 income tax return on the cash basis in the Third District of New York. The Guaranty Trust Company of New York, as trustee, filed an income tax return on the cash basis for each of the six trusts, of which John H. Acheson, Margaret Acheson Stuart and Edward G. Acheson, Jr., in 1935 was each a beneficiary. Acheson Corporation was organized under the laws of Delaware on November 12, 1915, with an authorized capital stock of $1,000,000, consisting of 10,000 shares (par $100). As of January 1, 1916, the date it began business, Acheson Corporation issued all of its authorized shares to Edward Goodrich Acheson and assumed his obligations of $200,800 and in exchange received from him securities, including 3.649 shares of Acheson Graphite Company, a New Jersey corporation (par $100), of the aggregate fair market value on January 1, 1916, of $2,112,299.66. Accordingly, the paid-in surplus of the corporation at the time of the commencement of its business was $911,499.66. On its books the corporation assigned a value of $1,327,300 to such securities and set up a paid-in surplus of $126,500. During 1935, Margaret M. Acheson owned 2,950 shares *38 of Acheson Corporation, which she had received in 1923 as a gift from her husband, Edward Goodrich Acheson. During 1935, the Guaranty Trust Company, trustee, owned 800 shares of Acheson Corporation for the benefit of each of Howard A. Acheson, Edward G. Acheson. John H. Acheson, Margaret Acheson Stuart, Veronica B. A. Mackey, and George W. Acheson, which shares had been transferred to it by Edward Goodrich Acheson under six separate trust indentures made on July 10, 1928. The total earnings and profits of Acheson Corporation from its incorporation to December 31, 1934, were $5,137,990.15. The total dividends paid in the same period out of earnings and profits were $3,664,100. In 1934, the corporation distributed $968,850.03 out of earnings and profits in redemption and cancellation of 1,000 of its own shares held by the executors of the estate of Edward Goodrich Acheson, deceased. Additional proper charges of $25,737.48 were made prior to December 31, 1934, to earned surplus. On January 1, 1935, the corporation had an earned surplus of $479,302.64. The earnings and profits of the corporation from January 1, 1935, to May 18, 1935, were $206,589.79. On April 1, 1935, the corporation *39 distributed a cash dividend of $63,000, leaving $622,892.43 in earned surplus as of April 2, 1935. Prior to May, 1935, Acheson Corporation acquired 9,000 shares of Acheson Graphite Corporation, of which 8,798 were not acquired out of its earnings or profits but in nontaxable exchanges of its own common shares which had been received by it from Edward Goodrich Acheson on January 1, 1916. In computing the net income of Acheson Corporation no gain or loss from any of such exchanges was recognized under the applicable federal income tax laws. Based upon the values of the common shares on January 1, 1916, the cost basis to Acheson Corporation of the 8,798 Graphite preferred shares was $280,892.32; the book value assigned to such shares was $175,138.09. The remaining 202 Graphite shares were purchased by Acheson Corporation at various times between December 5, 1926, and May 13, 1935, for cash at $100 per share, or a total purchase price of $20,200. At the time of such purchases, the time of such purchases, the Acheson Corporation had undistributed earnings at least equal to the cost. Pursuant to a resolution adopted by its Board of Directors on May 14, 1935, authorizing a distribution *40 of the 9,000 Graphite preferred shares in a "partial liquidation" of the corporation at the rate of one Graphite share for each one of its own shares, Acheson Corporation on May 18, 1935, distributed to Margaret M. Acheson 2,950 Graphite shares and to Guaranty Trust Company, trustee, 800 shares for each of the six separate trusts. No part of the 800 shares so received byguaranty Trust Company was distributed by it to the beneficiaries of the trusts, but all were retained by it as corpus. When the 9,000 Graphite preferred were distributed, no shares in Acheson Corporation were received by it and no change was made in the number or par value of its outstanding shares. The fair value on May 18, 1935, of the Graphite preferred was $110 per share. The appreciation of $794,661.91 ($990,000 - $195,338.09) was never recorded on the books of Acheson Corporation or reflected in its earnings, profits, or surplus account, and no income war profits or excess profits taxes were ever paid to the United States or to any other taxing authority upon such appreciation. When the 9,000 Graphite preferred were distributed, Acheson Corporation reduced its surplus by $195,338.09, being the aggregate of the *41 book value ($175,138.09) of the 8,798 shares and the purchase price ($20,200) of the 202 shares. The earnings and profits of Acheson Corporation from May 18, 1935, to December 27, 1935 (the date of the last cash distribution in 1935), was $349,183.56. In addition to the cash distribution of $63,000 on April 1, 1935, Acheson Corporation during 1935 made pro rata cash distributions as follows: July 1
$ 81,000
Oct. 1
102,150
Dec. 14
135,000
Dec. 27
117,000
Total
$435,150
Of the 1935 distributions, the Guaranty Trust Company, trustee, received 800/9000 for each of the six separate trusts and paid such amounts to the beneficiaries. Margaret M. Acheson received 2950/9000 of each 1935 distribution, a total of $163,282.50. 2. Margaret M. Acheson is the mother of Edward G. Acheson, Jr. Edward Goodrich Acheson, Sr., was chairman of the Board of Directors of Acheson Corporation until his death on July 6, 1931. Margaret M. Acheson then became chairman. Prior to May 23, 1931, Edward G. Acheson, Jr., was indebted to Power City Trust Company on a loan evidenced by a collateral note. He was requested to deposit more collateral or to pay off a substantial part of the note. At that *42 time, he was president of Acheson Corporation and he asked the Board of Directors for "some help in that direction". The Board determined that, instead of lending him additional collateral, the corporation would make him a loan, and pick up the note and the collateral. They felt that this should be supplemented by a guaranty from Margaret M. Acheson. Acheson Corporation advanced to Edward G. Acheson, Jr., $275,047.01 upon his 4 1/2 per cent three months' promissory note dated May 23, 1931, and the collateral was released by the Power City Trust Company. Margaret M. Acheson, with no discussion with Edward G. Acheson, Jr., or suggestion from him that she become a guarantor of his note, signed the following, dated May 23, 1931: "I hereby agree to indemnify the ACHESON CORPORATION for any loss that may occur through the loan being made to Edward G. Acheson, Jr. as of May 23, 1931 by the Corporation for the amount of Two Hundred Seventy Five Thousand Forty Seven Dollars and One Cent (275,047.01)." At that time she was neither a director nor an officer of the corporation. On May 23, 1931, the value of the collateral based upon the mean of market quotations was $227,509.37. By a renewal *43 note dated August 23, 1931, payment of the loan was extended for three months. The note was not paid when presented to the maker at the date of maturity, November 23, 1931. He had made only a small payment of interest. The value of the collateral was continuing to decline and Margaret M. Acheson became concerned as to her liability under her agreement. The collateral was sold for $137,054.80. $5,260.33 was applied to interest and $131,794.47 was applied upon principal. This left a balance due of $143,252.54. The question of enforcing payment under Mrs. Acheson's agreement was discussed by the officers and directors of Acheson Corporation at various times. Counsel was consulted who advised the directors that they could be held liable, particularly since all but 3,062 of the shares of the corporation were held in trusts. At a meeting of the Board of Directors December 10, 1935, the treasurer of the corporation was directed to demand immediate payment from Edward G. Acheson, Jr., of the balance due, and in the event payment was not promptly made, to request payment of Margaret M. Acheson in accordance with her written agreement. December 12, 1935, a written demand was made upon Edward *44 G. Acheson, Jr., and he replied that it was impossible for him to meet the demand. December 16, 1935, a written demand for payment was made upon Margaret M. Acheson. On December 30, 1935, by check for $143,252.54 to the Acheson Corporation, she paid the indebtedness. Edward G. Acheson, Jr., had since 1904 been variously employed in businesses founded by his father. In 1931, he was president and director of Acheson Corporation. He owned no shares in that corporation. Regarding the demand for payment and the sale of the collateral as unfriendly to him, he severed his connection with that company after the sale of the collateral. Thereafter, he received no salary from any source, and until 1936 he had no source of income other than a trust made by his father in 1928, from which he received $48,224 in 1931, $26,160 in 1932, $18,248 in 1933, $46,629 in 1934, and $39,479 in 1935. In 1934, he received $5,000 as executor's commission from the estate of his father. He was ill at various times in 1932, 1933, 1934 and 1935, and as a result incurred substantial hospitalization and medical expenses. He was first married in 1910. His wife died in 1928, leaving three children aged 13, 15 and 16. *45 He married again in 1931, but separated from his second wife in 1935 and was divorced in 1936. Pursuant to a separation agreement he paid her $100 a week. By the divorce decree, he was required to pay her alimony of $6,000 a year, and this was paid to her, pursuant to his assignment and direction, by the Guaranty Trust Company out of the income of the 1928 trust made by his father. After the divorce in 1936, he married again. On May 23, 1931, and in 1935, he owned and maintained a large house in Lewiston, New York, and maintained an apartment in New York City. He also owned a small house in Lewiston which had cost him $7,000. The large house originally cost $18,000. The addition of three acres and improvements increased his investment to $45,000-$50,000. On December 19, 1935, his mother made a trust of which he was income beneficiary for life, and to it transferred 140 shares of Acheson Corporation. He received no income from this trust in 1935. At the same time she made similar trusts for her other five children. All of his income until 1943 was used for living and household expenses, hospitalization and medical expenses, state and federal taxes and for assistance to his three sons, *46 one of whom had five children. He fell in arrears in his 1932 to 1934 income taxes and did not become current until 1943. Margaret M. Acheson was a keen business woman. Subsequent to July, 1931, she became chairman of the Board of Directors of Acheson Corporation and actively participated in its management. She well understood the liability she assumed in her agreement as to her son's indebtedness. She was familiar generally with her son's financial condition. She kept no books of account except a voucher record and a cash book. In her 1935 return, she took a bad debt deduction in the amount of $143,252.54. Memorandum Opinion STERNHAGEN, Judge: 1(a). Of the 9,000 shares of Graphite preferred distributed by the Acheson Corporation in 1935 to its shareholders, which the Commissioner has taxed to them as a dividend, 8,798 were acquired by the Acheson Corporation in a nontaxable exchange for securities which it had received in 1916 as part of the consideration for its shares originally issued upon organization and had been held by the corporation thereafter. During the period of holding, the new Graphite shares appreciated in value but were not the subject of any transaction whereby *47 the appreciation was brought to realization or was recognized as taxable income. The Commissioner has determined that the distribution of the Graphite shares to the shareholders was a realization of income by the corporation which engendered earnings and profits in the amount of the appreciation in value, and to the shareholders was a taxable dividend. This the shareholders contest. The question whether the distribution by a corporation of part of its assets, consisting of the shares in another corporation, which have appreciated in value, by the declaration of a dividend in kind of the shares, with no statement of cash equivalence, increases earnings and profits and is a dividend within the meaning of the revenue act, has been considered and decided in the negative in Estate of H. H. Timken, 47 B.T.A. 494, affirmed, Commissioner v. Estate of Timken, 141 Fed. (2d) 625 (C.C.A. 6th); National Carbon Co., Inc., 2 T.C. 57, on appeal C.C.A. 2d; [1] and in more recent memorandum opinions, some of which are on appeal, Carl A. Fisher, on appeal C.C.A. 10th; [2]Estate of Chester A. Congdon, *48 on appeal C.C.A. 8th; [3]Corinne S. Koshland et al., on appeal C.C.A. 9th. [4] See also Randolph E. Paul, "Ascertainment of 'Earnings or Profits' for the Purpose of Determining Taxability of Corporate Distributions," 51 Harvard Law Review 40 (1937), reprinted in Paul, Selected Studies in Federal Taxation, p. 149; Harry J. Rudick, "Dividends and Earnings under the Income Tax Law; Corporate Non-Liquidating Distributions," 89 U. of P.L.R. 865 (1941). The proportionate number of such 8,798 shares received by each of these taxpayers was not a dividend, within the statutory meaning of "dividend," in excess of the accumulated earnings and profits at date of distribution (without including therein any increment in value) and the Commissioner's determination to the contrary is incorrect. 1(b). The other 202 shares of Graphite preferred distributed as a dividend to the petitioners by the Acheson Corporation were acquired by that corporation *49 by purchase at a cost of $100 a share at various times after September 5, 1926, when it had accumulated earnings equal to such cost. The Commissioner insists that the entire value of these 202 shares is a "dividend" because when they were purchased the corporation had undistributed earnings at least equal to their cost. This propostion has also been considered, but not with a uniform result. The Commissioner relies upon Binzel v. Commissioner, 75 Fed. (2d) 989, which has been followed in Commissioner v. Wakefield, 139 Fed. (2d) 280. In the Binzel case the taxpayer-shareholder had not shown that the distribution was not in fact out of accumulated earnings and profits, and it has been frequently doubted whether if such evidence had been presented the Court would have held that the actual value of the property distributed; even though largely an increment, was to be regarded as earnings and profits to the full extent and thus to measure the "dividend." See Paul, supra; Rudick, supra, and National Carbon Co., Inc., supra.Mertens, Law of Federal Income Taxation, Vol. 1, §§ 9.49, *50 9.50. We are still of the view (especially since the retroactive amendment of the second Revenue Act of 1940) that the statute does not permit the increment in the value of the purchased shares to be regarded per se as within the corporation's earnings and profits, and that a distribution of such shares in kind (no amount of money equivalent being stated) constitutes a dividend of only the amount of the accumulated earnings and profits on hand at the date of distribution (excluding increment in value). To the extent of the value in excess of such accumulated earnings and profits, the Commissioner in all the dockets was in error in including the distribution in the taxpayers' dividends. Since the distribution of the 9,000 Graphite shares exhausted the accumulated earnings of $622,892.43 as of May 18, 1935, the cash distributions of $435,150 made thereafter are taxable only to the extent of $349,183.56, the earnings of the corporation from May 18 to December 27, 1935, the date of the last cash distribution. 2. In Docket No. 2715, the petitioner, Margaret M. Acheson, assails the Commissioner's disallowance of a deduction in 1935 of $143,252.54 as a worthless debt. Her argument *51 is that her agreement of 1931 was a guaranty of Edward's debt; that by her payment of it on demand of the creditor, she became subrogated to its rights against the principal debtor and became his creditor, and that, since he was unable to pay, she had a worthless debt. The proposition that her agreement was a guaranty is a fallacy. By its express terms, the agreement, which was with the corporation and not with the debtor, was an agreement of indemnity and not one of guaranty. No request was made upon the petitioner by the debtor, and no agreement was made with the debtor. When the corporation was giving consideration to Edward's request upon it for the loan of additional collateral to further secure his loan with the then creditor, the corporation asked her "if it was agreeable to give a guarantee". She gave a written agreement not of guaranty but of indemnity, and the corporation thereupon paid Edward's debt to his former creditor and took over the debt. The agreement was not a guaranty of Edward's debt but an independent indemnity against loss in the event that the debt of Edward should not be paid. It was given by her to save the corporation from loss in collection. So far as *52 the evidence shows, her agreement with the corporation was voluntary. Her performance of her agreement of indemnity did not result in a debt to her. It gave her no claim against Edward, unless there were circumstances to support a claim in equity as a basis for subrogation. The mere payment by her under a voluntary indemnity would not support the recognition of a legal debt of Edward to her. In Howell v. Commissioner, 69 Fed. (2d) 447, it was held that an indemnitor who pays to the principal creditor is not a guarantor who by subrogation takes the rights of the creditor and thereby becomes entitled to a deduction of the amount paid as a debt ascertained to be worthless. See also United States v. Mitchell, 74 Fed. (2d) 571. There is a distinction between a case of indemnity and a case of guaranty in which the guarantor pays the guaranteed debt and shows that the principal debt, to which he is immediately entitled, is worthless. See Shiman v. Commissioner, 60 Fed. (2d) 65; Whitcher v. Welch, 22 Fed. Supp. 763; Daniel Gimbel, 36 B.T.A. 539; *53 Alice du Pont Ortiz, 42 B.T.A. 173, 187, reversed on another point, 124 Fed. (2d) 156. While the point must be decided against the taxpayer on the above ground, we think that the evidence does not establish that, if her payment to the corporation were to be regarded as pursuant to a guaranty instead of an indemnity, there was necessarily a subrogation or that the resulting debt to her was ascertained to be worthless. She did not take the note; she made no demand upon the debtor and he made no refusal. He was not insolvent, and it cannot be said with any assurance how much could have been collected from him if the taxpayer in her alleged capacity as subrogated creditor had taken the note and then pursued her available legal and equitable remedies against him. Her untested opinion that he was unable to pay is alone not sufficient to prove that the debt was ascertained by her to be worthless. We are not called upon to decide, as a court of equity might be required in a proper case to do, the extent to which the income from the two trusts was under New York law unavailable to a creditor for the payment of the beneficiary's debts. *54 It may be doubtful whether there is in the record enough evidence to enable this Court to decide that question de novo as a step in determining a tax deduction for a worthless debt. Decisions in all the dockets will be entered under Rule 50.
Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Margaret M. Acheson, Margaret Acheson Stuart, Howard A. Acheson Trust, Edward G. Acheson Trust, John H. Acheson Trust, Margaret Acheson Stuart Trust. Veronica B. A. Mackey Trust, George W. Acheson Trust, and Edward G. Acheson, Jr.↩
1. Commissioner's appeal dismissed, December 7, 1944. ↩
2. Commissioner's appeal dismissed, September 4, 1945. ↩
3. Commissioner's appeal dismissed, August 13, 1945. ↩
4. Commissioner's appeal dismissed, June 29, 1945.↩