Elgin Building Corporation, a Dissolved Corporation, by C. H. Olson, Trustee v. Commissioner. An-Lo Company, a Dissolved Corporation, by C. H. Olson, Trustee v. Commissioner. Waco Building Company, a Dissolved Corporation, by C. H. Olson, Trustee v. Commissioner.
Elgin Bldg. Corp. v. Commissioner
Docket Nos. 14049, 14050, 14051.
United States Tax Court
1949 Tax Ct. Memo LEXIS 264; 8 T.C.M. (CCH) 114; T.C.M. (RIA) 49015; February 15, 1949
Robert Ash, Esq., Munsey Bldg., Washington, D.C., Carl F. Bauersfeld, Esq., and Frank L. Wilcox, C.P.A., Waco, Tex., for the petitioners. John W. Alexander, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These consolidated proceedings were brought for a redetermination of deficiencies in income, declared value excess-profits, and excess-profits tax and penalties as follows: ELGIN BUILDING CORPORATION
Declared Value
Excess-Profits
25%
Year
Income Tax
Excess-Profits Tax
Tax
Penalty
June 30, 1944
$ 709.45
$ 415.33
June 30, 1945
3,540.85
2,680.76
$3,542.62
$885.65
TOTALS
$4,250.30
$3,096.09
$3,542.62
$885.65
*265 AN-LO COMPANY
Declared Value Excess-
Year
Income Tax
Profits Tax
TOTAL
June 30, 1945
$857.12
$521.38
$1,378.50
WACO BUILDING COMPANY
Year
Declared Value
Excess-Profits
25%
Dec. 1, 1942 to
Income Tax
Excess-Profits Tax
Tax
Penalty
June 30, 1943
$ 236.37
$ 141.12
June 30, 1944
240.49
$ 7,954.93
$1,988.73
June 30, 1945
3,387.53
3,660.92
9,538.83
2,384.71
TOTALS
$3,623.90
$4,042.53
$17,493.76
$4,373.44
The questions presented are whether gains from the sale of certain houses are taxable to petitioner corporations or to a related partnership; whether the gains are taxable as ordinary income or as capital gains; and if taxable to the corporations, the amount of the deductions to be allowed them for officers' salaries. There is also the question of penalties asserted for failure to file excessprofits tax returns. The cases were presented upon a stipulation of fact and evidence adduced at the hearing. Those facts hereinafter appearing which are not from the stipulation are otherwise found from the record. Findings of Fact The stipulated facts are hereby found accordingly. The returns which *266 the several petitioners filed were filed with the collector of internal revenue for the first district of Texas at Austin, Texas. Petitioners are all Texas corporations which were dissolved on January 14, 1947. The proceedings were brought in the names of the respective petitioners by C. H. Olson, trustee, who had been president and director of each of the corporations. C. H. Olson has been in the lumber business practically all of his adult life. During the years 1941 to 1946. C. H. Olson and Carl Casey operated a lumber company under the name of Olson Lumber Company, Ltd., a limited partnership. With the advent of World War II there was a housing shortage in the area of Waco, Texas. In that area the Bluebonnet Ordnance Plant, two Army air fields, an Army camp, and two canvas plants were located. They all required the services of defense employees. Shortly after Pearl Harbor, December 7, 1941, Federal Housing Administration (hereinafter referred to as F.H.A.) officials called all lumber dealers and contractors in the Waco area to Dallas, and undertook to enlist their aid in an effort to have defense housing units built in the Waco area. The F.H.A. officials explained that *267 it was contemplated that the builders could form small corporations to handle the transactions so that they would have no individual liability, and that they would receive priorities to build defense houses. The F.H.A. officials advised that the houses were to be constructed for rental purposes; that the purpose of the program was to provide rental housing for defense workers so that they would not have to buy a house in order to stay on the job. C. H. Olson, Carl Casey, and his son Floyd Casey, agreed to take part in the defense housing program and to this end organized the Waco Building Company, hereinafter called Waco, on January 24, 1942, and the Elgin Building Corporation, hereinafter called Elgin, on February 1, 1943. The An-Lo Company, hereinafter called An-Lo, was organized by third parties on March 16, 1942. Its capital stock and assets were acquired for the same purpose by C. H. Olson, Carl Casey, and Floyd Casey on November 14, 1942. The corporations were to be the medium for the transaction of business under Title VI of the National Housing Act. The purposes for which Elgin was formed, as stated in its charter, were: "* * * the buying, improving, and selling real *268 estate; of building, selling and leasing residences and other buildings on such real estate; and of borrowing money and incumbering said real estate when improved, and of selling and assigning the notes and liens thereon; and all such other purposes as are usually incident to the real estate and building business; * * *" The purposes for which An-Lo was incorporated, as stated in its charter, were: "* * * to erect or repair any building or improvement, and to accumulate and lend money for said purposes, and to purchase, sell and subdivide real property in towns, cities and villages and their suburbs not extending more than two miles beyond their limits and to accumulate and lend money for that purpose." The purposes for which Waco was incorporated, as stated in its charter, were: "* * * the buying, improving, and selling real estate; of building, selling and leasing residences and other buildings on such real estate; and of incumbering said real estate when improved and of selling and assigning the notes and liens thereon; and all such other purposes as are usually incident to the real estate business, and of building and otherwise improving the same, * * *" Under Title VI *269 of the National Housing Act, which provided the congressional authority for expediting defense housing in this manner and contemplated increasing the availability of rental properties by authorizing government guarantee of loans by private lending institutions up to 90 per cent of the appraised value, it was the policy of F.H.A. to make rather liberal appraisals of properties that met its construction requirements. The formula used was to appraise the house as being worth what it would cost an efficient builder to construct it, plus a 10 per cent profit on the construction, plus the cost of the lot. Usually the amount of the loan which was approved paid for the cost of the house and the lot so that the taxpayers would get loans in amounts sufficient to reimburse them completely for the cost of the buildings and lots. The capital stock of Elgin amounted to $3,000; that of An-Lo amounted to $1,000, and that of Waco amounted to $2,500. C. H. Olson, Floyd Casey, and Carl Casey owned all of the stock of each of the corporations. C. H. Olson was president, Carl Casey was vice-president, and Floyd Casey was secretary-treasurer of the corporations, respectively. In order to obtain commitments *270 for the loans and priorities for the construction of the defense housing units, it was necessary for C. H. Olson, Floyd Casey, and Carl Casey to submit financial statements to F.H.A., showing that they were financially able to carry on the construction program. Petitioners did not have sufficient capital to finance the construction, and the money was advanced by Olson Lumber, Ltd., and Floyd Casey. Floyd Casey advanced as much as $125,000 toward construction of these houses, and Olson Lumber, Ltd., had its entire net worth of between $30,000 and $40,000 invested in the projects. Olson Lumber, Ltd., carried on the construction of the houses as the general contractor. In order to construct the defense housing, it was first necessary to obtain priorities for materials from the War Production Board. It was then necessary to purchase the lots and submit the location of the lots, together with the plans and specifications for the houses to be erected thereon, to F.H.A. F.H.A. inspected the construction at various steps but did not make any insured loan under Title VI until the houses were fully completed and accepted by their inspectors. To effect the loan the usual practice was to *271 have petitioners give a deed of trust and notes to a lending institution approved by F.H.A., whereupon F.H.A. would insure the loan to the lending institution. In the Application for Preference Rating on Material Entering into Construction of New Privately Owned Defense Housing Nos. 11200389, 711200267, 711200629, and 711200633, submitted to the Office of Production Management under the dates respectively of February 17, 1942, August 20, 1942, August 24, 1942, and September 22, 1942, Waco agreed to construct the houses for rent at a fixed monthly rental to persons engaged in war activities. These applications were approved for rental purposes only. In the Applications for Approval of Residential Construction Nos. 911200397, 911200433, 711200643, 911200405, 911200428, and 911200148, submitted to the War Production Board, dated respectively December 1, 1943, March 17, 1944, January 14, 1943, December 10, 1943, March 13, 1944, and April 6, 1943, and approved respectively February 2, 1944, April 12, 1944, January 22, 1943, January 26, 1944, April 20, 1944, and May 25, 1943, the respective petitioners agreed to hold the housing units for rent to war workers at a fixed monthly rental *272 except as otherwise authorized by General Orders 60-2 and 60-3 of the National Housing Agency. They further agreed not to dispose of or enter into any agreement or contract for the disposal of any housing unit except as authorized by General Orders 60-2 and 60-3 of the National Housing Agency in effect as of the date of filing the application. No application was made to the Government by petitioners or the individuals behind them for permission to sell the defense houses. When the defense housing program under Title VI was begun, it was generally felt that after the war there would be a surplus of houses, and the houses constructed under this program would become vacant, and eventually F.H.A. would have to take title to them under the loans. During the years 1942, 1943, and 1944, and under this program, Elgin constructed 65 defense housing units, Waco constructed 136 houses, and An-Lo constructed 34 houses. The houses were built of good materials and provided permanent housing facilities. Between 30 and 40 of these houses were furnished prior to renting them. Many of the houses were sold by the corporations prior to April, 1944. They were sold either to tenants who occupied *273 the houses or to non-tenants when the houses were vacant. Neither C. H. Olson, Carl Casey, or Floyd Casey, nor anyone connected with petitioners, had a real estate license, and most of the houses were sold by real estate brokers. No "For Sale" signs were ever displayed on any of the houses. This was pursuant to instructions to the brokers. Elgin's board of directors held meetings on April 22, 1944, and June 24, 1944, during which it was decided that Elgin would convey various properties to C. H. Olson. The minutes of the respective meetings provided in part substantially as follows: "* * * it is resolved that all of the property, premises and improvements, and/or the equities therein, be conveyed to C. H. Olson, individually, for a consideration of $1.00 cash for each piece of property, and the other and further consideration of the extraordinary time, attention, and ability devoted to said corporation by the said C. H. Olson; that the said C. H. Olson shall not assume or in any manner become personally liable for, but take said respective pieces of property subject to the respective indebtedness against the same, and that no one lot or piece of said property shall in any manner *274 be burdened with the incumbrance or indebtedness against any other lot or piece of property, but each separate lot and its improvements shall only be burdened with such incumbrance or indebtedness as may now exist against such lot and improvements; and that the Vice-President of said Corporation, Carl Casey, make, execute, acknowledge and deliver unto the said C. H. Olson, the Warranty Deed of said Corporation to the following described property, premises and improvements, lying and being situated in Waco, McLennan county, Texas, and described thus: * * *" The boards of directors of An-Lo and Waco held meetings on June 10, 1944 (An-Lo); May 6, 1944 (Waco); and May 15, 1944 (Waco), the respective minutes of which were substantially similar to those quoted above. The partnership known as Olson & Casey was organized on May 1, 1944. The members of the partnership were C. H. Olson, Carl Casey, and Floyd Casey, and it held the assets in substantially the same proportions as the individuals had held the corporate stock. The partnership was organized to take over the defense housing units. It had no other assets. There was no written partnership agreement. C. H. Olson, Carl Casey, and *275 Floyd Casey desired to form the partnership and have it take over the properties in order to eliminate the necessity for keeping three sets of books and bank accounts. Title to the houses was transferred to the partnership by transferring them to C. H. Olson as trustee or agent for the partnership. In order to protect the other partners, Olson gave a deed to Floyd Casey, which was not recorded, for a half interest in each of the properties transferred from the petitioner corporations to C. H. Olson. When the houses were later sold the unrecorded deed would be destroyed. When the houses were subsequently sold by the partnership, the deed would run from C. H. Olson to the individual purchasers. In some instances, where deeds had not been made to C. H. Olson but were treated on the books of the corporations and on the books of the partnership as having been transferred to the partnership, the deed was made directly from the petitioner corporations to the purchaser. The reason this occurred was because the lawyer for the petitioner corporations and for Olson & Casey became ill and subsequently died, and some of the deeds were not made transferring the title from the corporation to *276 C. H. Olson. Separate books of accounts were always maintained by petitioners and by the partnership known as Olson & Casey. All the deeds executed by petitioners in favor of C. H. Olson, by which the houses were conveyed to Olson, recited that the corporations had received $1.00 cash and other good and valuable consideration although actually no consideration passed. They further provided that the grantee, C. H. Olson, did not "assume or in any manner become personally liable for, but takes the hereinafter described property, premises, and improvements subject to the unpaid balance of the principal and interest now owing on one certain installment promissory note * * *." In deeds executed by petitioners to other individuals who purchased the houses, the deeds recited that the grantees assumed "payment and full discharge" of the balance owing on the notes executed by the corporations in favor of the loan company. The properties conveyed to C. H. Olson by petitioners all had net values over and above the outstanding indebtedness against them, and they would not have considered conveying them to a stranger without receiving substantial monetary consideration therefor. Petitioners *277 remained liable on the notes and mortgages executed by them on the properties after the properties were conveyed to C. H. Olson. Detailed information relating to the houses sold is as follows: ELGIN BUILDING CORPORATION YEAR ENDED JUNE 30, 1944 Date
Date
Date
Sold
Houses were
Deeded to
Sold to
Months
to
Address
Completed
C. H. Olson
Consumer
Rented
Tenant
1716 Gurley
9/ 7/43
4/29/44
5/15/44
8
no
1704 Gurley
9/ 7/43
Not deeded
1/27/44
5
no
1717 Connor
7/16/43
Not deeded
2/23/44
8
no
1701 Baylor
9/25/43
Not deeded
5/ 1/44
7
no
2009 Park
11/20/43
Not deeded
4/20/44
5
no
2004 Park
9/14/43
4/29/44
5/17/44
8
no
1609 No. 18
6/ 9/44
Not deeded
6/13/44
0
no
1637 No. 18
5/ 1/44
Not deeded
6/12/44
0
no
1641 No. 18
6/ 9/44
Not deeded
6/13/44
0
no
1641 No. 15A
6/21/44
Not deeded
6/23/44
0
no
1645 No. 15A
6/21/44
Not deeded
6/22/44
0
no
ELGIN BUILDING CORPORATION YEAR ENDED JUNE 30, 1945 Date
Date
Date
Sold
Houses were
Deeded to
Sold to
Months
to
Address
Completed
C. H. Olson
Consumer
Rented
Tenant
1716 Gurley
9/ 7/43
(Prior year adjustment)
1709 Connor
7/14/43
4/29/44
6/ 6/45
22
yes
1708 Connor
7/ 1/43
4/29/44
5/ 4/45
22
no
1713 Park
8/16/43
4/29/44
9/21/44
13
no
1709 Park
8/ 2/43
4/29/44
4/ 5/45
20
no
1716 Park
9/14/43
4/29/44
5/15/45
19
no
1712 Dutton
1/ 6/44
4/29/44
6/19/45
17
no
1701 Baylor (Prior year adjustment (see Job No. 26 in Schedule "A"))
1700 Park
8/20/43
4/29/44
6/ 6/45
21
no
2017 Gurley
11/24/43
4/29/44
4/13/45
18
no
2020 Baylor
11/17/43
4/29/44
4/30/45
19
no
2013 Park
11/20/43
4/29/44
6/ 6/45
18
no
2017 Park
11/17/43
4/29/44
4/13/45
18
no
2021 Park
11/24/43
4/29/44
5/24/45
17
no
2000 Park
9/14/43
4/29/44
6/13/44
22
no
2012 Park
9/20/43
4/29/44
1/20/45
13
no
2020 Park
11/17/43
4/29/44
3/ 8/45
14
no
1816 Dutton
1/ 6/44
4/29/44
2/23/45
13
no
1621 No. 18
4/15/44
6/28/44
4/ 5/45
10
no
1625 No. 18
5/ 1/44
6/28/44
3/ 3/45
6 1/2
no
*278 AN-LO COMPANY YEAR ENDED JUNE 30, 1945 Date
Date
Date
Sold
Houses were
Deeded to
Sold to
Months
to
Address
Completed
C. H. Olson
Consumer
Rented
Tenant
2720 Herring
1/20/45
Not deeded
1/20/45
0
no
2712 Windsor
11/15/44
Not deeded
11/29/44
0
no
2004 Saunders
12/29/43
6/17/44
1/16/45
12 1/2
no
2008 Saunders
2/17/44
6/17/44
6/ 1/45
13
yes
2108 Saunders
3/ 9/44
6/17/44
1/31/45
10
yes
WACO BUILDING CO. YEAR ENDED JUNE 30, 1944 Date
Date
Sold
Houses were
Sold to
Months
to
Address
Completed
Consumer
Rented
Tenant
2512 Herring
6/11/42
3/ 7/44
21
no
2724 Herring
5/ 2/42
10/29/43
16 1/2
no
2817 Colonial
6/25/42
8/24/43
13 1/2
no
2813 Colonial
6/25/42
9/14/43
15
no
3013 Live Oak
7/14/42
10/24/43
15
no
3021 Live Oak
7/22/42
1/18/44
16 1/2
no
3004 Live Oak
6/21/42
3/14/44
21
no
3920 Beverly Dr.
6/18/42
Jan. '44
18 1/2
no
3936 Beverly Dr.
10/16/42
7/ 7/43
8 1/2
no
3940 Beverly Dr.
10/16/42
11/18/43
13
yes
3948 Beverly Dr.
8/ 7/42
7/12/43
11
no
2221 Pine
10/ 9/42
8/27/43
10
no
2737 Proctor
12/23/42
Nov. '43
9 1/2
no
3008 Pine
3/12/43
10/ 8/43
6 1/2
no
3016 Pine
3/ 6/43
3/13/44
11 1/2
no
1820 Lyle
4/ 6/43
10/11/43
5
no
3113 Live Oak
6/10/42
5/ 6/44
23 1/2
no
3108 Live Oak
7/ 3/42
5/15/44
23
yes
2712 Proctor
9/ 3/42
Mar. '44
0
no
2116 Pine
11/ 9/42
3/27/44
17
no
1031 N. 34
6/21/44
6/26/44
0
no
3012 Pine
3/ 6/43
8/24/43
5 1/2
no
*279 WACO BUILDING CO. YEAR ENDED JUNE 30, 1945 Date
Date
Date
Sold
Houses were
Deeded to
Sold to
Months
to
Address
Completed
C. H. Olson
Consumer
Rented
Tenant
3116 Beverly Dr.
6/18/42
5/10/44
10/21/44
29
no
2605 Proctor
5/ 8/42
5/10/44
7/25/44
27
yes
3928 Beverly Dr.
10/16/42
5/10/44
7/ 6/44
19 1/2
no
3932 Beverly Dr.
10/16/42
5/10/44
6/16/45
30
no
2208 Pine
9/ 9/42
5/10/44
6/11/45
33
no
2212 Pine
8/ 1/42
5/10/44
8/11/44
22 1/2
no
2120 Pine
11/12/42
5/10/44
8/ 9/44
20
no
2217 Pine
10/ 7/42
5/10/44
12/ 5/44
27
no
2717 Proctor
1/ 1/43
5/22/44
7/20/44
17
no
2721 Proctor
2/ 1/43
5/22/44
5/26/45
28
no
2609 Alexander
1/12/45
1/12/45
5/ 1/45
4
no
2628 Windsor
1/12/45
1/12/45
3/29/45
3
no
2616 Windsor
1/19/45
Not deeded
5/ 2/45
3 1/2
no
2637 Alexander
11/ 6/44
Not deeded
11/ 6/44
0
no
2713 Cumberland
11/ 8/44
Not deeded
11/ 8/44
0
no
1646 No. 15-A
11/14/44
Not deeded
11/27/44
0
no
1642 No. 15-A
11/14/44
Not deeded
11/14/44
0
no
1620 No. 15-A
9/25/44
9/25/44
10/ 9/44
0
no
1604 No. 15-A
9/25/44
9/25/44
9/29/44
0
no
2700 Windsor
11/29/44
Not deeded
11/29/44
0
no
2624 Windsor
12/30/44
Not deeded
12/30/44
0
no
2629 Alexander
11/ 6/44
Not deeded
11/ 6/44
0
no
2605 Alexander
11/27/44
Not deeded
11/27/44
0
no
1629 No. 15-A
9/23/44
9/23/44
9/26/44
0
no
2709 Cumberland
10/31/44
10/31/44
11/ 6/44
0
no
2632 Windsor
12/21/44
Not deeded
12/21/44
0
no
3113 Live Oak (Prior year adjustment)
0
2701 Cumberland
11/ 8/44
Not deeded
11/ 8/44
0
no
*280 For the fiscal year ended June 30, 1945, the alleged partnership of Olson & Casey reported a net gain of $30,582.43 from the sale of four An-Lo houses, thirteen Elgin houses, and twenty-three Waco houses. Many of these properties were conveyed directly to the purchasers by the corporations. For the fiscal year ended June 30, 1944, Elgin reported as capital gain profit from the sale of certain defense housing units in the amount of $6,224.38. Elgin did not report the gain of $2,084.98 on the sale of two houses, being 1716 Gurley Street and 2004 Park Street. The profit from the sale of those two houses was reported at capital rates on the partnership return of Olson & Casey. Respondent determined that the gain on these sales was taxable to Elgin. For the fiscal year ended June 30, 1945, respondent determined that the gain on the sale of certain defense houses in the amount of $15,180 was taxable to Elgin. This gain was reported as capital gain on the partnership return filed by Olson & Casey. For the fiscal year ended June 30, 1945, respondent determined that the gain on the sale of certain defense houses in the amount of $2,746.55 was taxable to An-Lo. This gain was reported *281 by Olson & Casey on the partnership return they filed. For the fiscal year ended June 30, 1944, respondent determined that the gain on the sale of certain defense houses in the amount of $21,242.01 was taxable to Waco as ordinary income instead of at capital gain rates as reported. For the fiscal year ended June 30, 1945, respondent determined that the gain on the sale of certain defense houses in the amount of $26,408.22 was taxable to Waco. This income was reported at capital gain rates on the partnership return which was filed by Olson & Casey. All of the houses which were sold without ever having been rented were produced and held primarily for sale to customers in the ordinary course of petitioners' trade or business within the meaning of Internal Revenue Code, section 117. As president of the corporations and as a partner, C. H. Olson devoted practically all of his time in the care and operation of the housing properties. He inspected them, attended to redecorating, collected rents, and made payments on the mortgage. Floyd Casey, as secretary-treasurer of the corporations and as a partner, performed similar duties to those performed by C. H. Olson. *282 He was engaged in the investment business and maintained an office in the Amco Building in Waco. He could be reached by telephone by C. H. Olson at any time Olson needed to confer with him. In the calendar year 1944 he had gross income of $49,873.31 which included his salary from petitioners. During that year he was a member of seven different partnerships, none of which relate to this proceeding. In 1945 he reported gross income of $47,894.20 and stated that his occupation was "various," and that he belonged to six different partnerships in addition to Olson & Casey. Carl Casey, as vice-president of the corporations, and as a member of the partnership, signed documents in the absence of the president and consulted with his father and C. H. Olson on the defense housing business. He resided in Dallas, and in the calendar year 1945 he had a gross income of $104,582.72. He stated his occupation on his Federal income tax return for that year to be "refinery." He was also a member of six different partnerships beside Olson & Casey. During the fiscal year ended June 30, 1945, and in prior years Carl Casey would usually drive on Saturday mornings from Dallas to Waco, the home of his father *283 and, if necessary, would confer with his father and C. H. Olson with regard to any business matters relating to the defense housing properties. The gross income and net profits of petitioners, respectively, before any allowance of officers' salaries as shown by the notice of deficiency for the fiscal year ended June 30, 1945, were as follows: Net Profit
before
Gross
Officers'
Income
Salaries
Elgin Building Corp.
$44,348.81
$20,308.81
An-Lo Company
15,436.61
3,949.87
Waco Building Company
45,660.85
27,734.26
At the end of the fiscal year ended June 30, 1945, Olson & Casey had 113 of the defense houses rented. In its corporation income and declared value excess-profits tax return for the fiscal year ending June 30, 1944, Elgin deducted from its gross income $2,748 as compensation of officers which it explained in Schedule F as $1,374, paid to C. H. Olson as president, and $1,374 paid to Floyd Casey as secretary-treasurer. In its corporation income and declared value excess-profits tax return for the fiscal year ending June 30, 1944, Waco deducted from its gross income $3,471.60 as compensation of officers which it explained in Schedule *284 F as a payment of $1,735.80 to C. H. Olson as president, and $1,735.80 to Floyd Casey as secretary. In its corporation income and declared value excess-profits tax return for the taxable period beginning December 1, 1942, and ending June 30, 1943, Waco deducted from gross income $2,100 as compensation of officers which was explained in Schedule F as $1,050 to C. H. Olson as president, and $1,050 to Floyd Casey as secretary-treasurer. It stated that each of them devoted part time to the business. In its corporation income and declared value excess-profits tax return for the fiscal year ending June 30, 1944, An-Lo deducted $3,222 from gross income as compensation of officers, which it explained in Schedule F as compensation, of $1,611 to C. H. Olson as president, and $1,611 to Floyd Casey as vice-president. Petitioners' officers did not make out petitioners' Federal tax returns. They employed a certified public accountant to make out their returns who could be reasonably expected to be trusted in income tax matters. They relied upon his advice as to all tax matters. Petitioners did not know and were not advised by the accountant that they were required to file excess-profits tax *285 returns for either the year ended June 30, 1944, or June 30, 1945. The accountant did not expressly advise them that corporation excess-profits tax returns for these years need not be filed. The accountant, after consideration of the manner in which the gain from the sale of the defense housing units should be reported, concluded in his judgment that the houses were capital assets because the individuals involved definitely felt they were going into the long-range rental housing business. In the notice of deficiency to Waco respondent made the following explanation of adjustments with reference to the year ended June 30, 1945: "(a) and (c) It is held that interest in the amount of $1,571.55 received on notes which belonged to you prior to their alleged transfer to the Olson and Casey partnership on June 30, 1944, and on notes subsequently received, constitutes income taxable to you. The transaction of transferring the assets was for the primary purpose of minimizing taxes and was not made at arm's length, therefore the income is deemed taxable to you. Gain of $26,408.22 from sales of the properties is held taxable to you as ordinary income. "(b) Rentals received from dwellings *286 belonging to you but which were allegedly transferred on June 30, 1944 to Olson and Casey, and rental received on dwellings subsequently built by you on priorities issued to you by the National Housing Agency, are deemed to be taxable to you. "(d) In view of the holding resulting in adjustments (a) and (b) above the operating expenses claimed by the Olson and Casey partnership and listed below are deemed deductible by you: "Salaries and wages
$1,070.75
"Repairs
1,121.24
"Interest paid
5,175.49
"Taxes paid
2,763.83
"Depreciation
4,247.00
"Other deductions
3,548.28
"Total
$17,926.59"
Statements of similar import were made in the notices of deficiency to Elgin and An-Lo. Opinion This proceeding, in so far as it deals with respondent's attempt to attribute, to petitioner corporations, income resulting from the operation and sales of properties formerly owned by them, is best approached by eliminating the aspects of the general problem which, as the case is presented, the parties mutually agree do not apply. This is not an effort by respondent under section 45 to reallocate income, [1] nor is it a Court Holding Company situation.[2]Commissioner v. Court Holding Co., 324 U.S. 331. *287 Petitioners contend that they were purely the alter ego of their stockholders, holding the properties as a mere nominee and transferring them to the stockholders in order to merge the legal and equitable titles. Cf. Burnet v. Commonwealth Improvement Co., 287 U.S. 415. But on this aspect of the case, the theory is urged, not as a direct consideration affecting the present liability of petitioners, but rather to explain the failure of the stockholders to report the receipt of the properties either as compensation for services or as a distribution in liquidation or a dividend. Cf. Commissioner v. Ashland Oil & Refining Co. (C.C.A., 6th Cir.), 99 Fed. (2d) 588, certiorari denied, 306 U.S. 661. Since the stockholders are not before us, we defer consideration of the argument until later. *288 The record is confusing, the facts somewhat complicated, and the result rendered unnecessarily difficult by the failure of the parties to meet on a clear-cut issue of law. But the circumstances that the properties were in fact transferred by petitioners before any of the income was realized which is here in issue, is sufficient in our view to dispose of this phase of the proceeding. Whether the transfers constituted a distribution in liquidation or a dividend, or, as the corporate minutes suggest, compensation for personal services, or a sale for inadequate consideration, we need not determine. There is no suggestion that the transfers resulted in a gain to petitioners because the stockholders paid for them, cf. Burnet v. Commonwealth Improvement Co., supra, or that the properties were not actually conveyed by petitioners to the stockholders. If the transaction was not one at arm's length, it might preclude the purchase price from acceptance at its face value, and possibly demonstrate that there was a distribution rather than a sale. Palmer v. Commissioner, 302 U.S. 63; John Q. Shunk, 10 T.C. 293. But there is nothing in the record to overcome *289 the prima facie evidence that, whatever its true character and collateral consequence, a transfer for all purposes, rendering the transferees liable for taxation on future income, was the actual and inescapable outcome. Estate of H. H. Timken, 47 B.T.A. 494, 514, affirmed (C.C.A., 6th Cir.), 141 Fed. (2d) 625. The end result was that petitioners, with evidently the generic possibility of sales in mind but no particular purchaser or negotiations pending, transferred their property outright without reservation to their stockholders. From that time on, the operating income and the capital gain were not attributable to petitioners. Acampo Winery & Distilleries, Inc., 7 T.C. 629; Estate of H. H. Timken, supra: What we have said, however, does not apply in some thirteen instances in which individual houses were never included in the transfer to the stockholders and were deeded directly by the respective petitioner to the purchaser. Whatever petitioners may have intended and however much an actual change of ownership might have affected the outcome, we cannot say as to these instances that the sales were not those of the corporate *290 petitioners not that the gain is not chargeable to them. Commissioner v. Court Holding Co., supra., Rose Kaufmann, 11 T.C. 483. And petitioners' attempt to invoke the "alter ego" theory, in disregard of their own existence and function, and avoid the tax consequence of a disposition of their own property, is unconvincing in view of their treatment by their officers and stockholders for tax and other purposes as separate. Burnet v. Commonwealth Improvement Co., supra. As to these properties and others, which were admittedly retained and sold by the corporate petitioners and not the stockholders, the further issue is whether the gain on the sale of the houses was capital gain, as petitioners treated it, or ordinary income. Petitioners claim the protection of section 117 (j), Internal Revenue Code, [3] on the ground that this was not property held primarily for sale to customers in the ordinary course of their trade or business. *291 We may readily agree that a part of petitioners' ordinary business was the construction of houses for rent under F.H.A. regulations and war industry priorities. But the "frequency" and the "continuity," James Lewis Caldwell McFaddin, 2 T.C. 395, affirmed (C.C.A., 5th Cir.), 148 Fed. (2d) 570, of their sales of non-rental properties persuades us that the ordinary course of their business also included the construction of houses for sale and not for rent when that was permitted by the regulations [4] and priorities granted. Under petitioners' commitments, if a house was once rented, it could not be sold unless the tenant exercised his option to purchase or an outsider bought subject to the tenant's rights. As to all of these properties, we agree that this circumstance stamped their primary purpose as rental or incomeproducing housing; and that they were capital assets under section 117 (j). With respect, however, to the properties that were sold without ever having been rented, and mostly within very brief periods after completion, we conclude that they were held, and in fact produced, *292 primarily for sale, and that the gain on their disposition was ordinary income. Their number, frequency, and regularity require that conclusion. Spanish Trail Land Co., 10 T.C. 430. From our findings, it will be possible for the parties to segregate the two classes of properties and determine the amount of ordinary income in the recomputation. A third issue with respect to a claim for additional officers' salary tendered, in the alternative only, becomes moot as the case was presented and upon our disposition favorably to petitioners of their contention that they were not liable for the income after the properties had been transferred. There is no evidence that any of the services were rendered by the officers with respect to the few properties whose disposition resulted in gain for which we have found petitioners chargeable. The final issue is whether petitioners are liable for delinquency penalties for their failure to file excess-profits tax returns. As the primary issues have been dealt with, it does not appear that the final figures on the recomputation can conceivably result in excess-profits tax income for any of the petitioners in any year beyond the permitted *293 exception. Section 710, Internal Revenue Code. No tax being due, there would be no penalty, Oklahoma Contracting Co., 35 B.T.A. 232, 238, and discussion of the respective contentions of the parties, as to the existence of reasonable cause for failure to file becomes unnecessary. Decisions will be entered under Rule 50. Footnotes
1. "Mr. Alexander [respondent's counsel] * * * "Now, the Respondent has not in any of these deficiency letters referred to Section 45. We have not attempted to make a reallocation of income. * * * ↩
2. "The Court: * * * "May I ask you this question, Mr. Ash [petitioner's counsel]? Is there an element of the Court Holding Company proposition in this situation? "Mr. Ash: None at all. "The Court: There is no contention that the sales were all arranged before the properties were transferred and they were just made by the partnership? "Mr. Ash: It is my understanding there is no such contention."↩
3. "SEC. 117. CAPITAL GAINS AND LOSSES. * * *
"(j) Gains And Losses From Involuntary Conversion And From The Sale Or Exchange Of Certain Property Used In The Trade Or Business. - "(1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * * "(2) General Rule. - If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business * * * exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *"↩
4. Code of Federal Regulations, Title 24↩, Chapter VII, § 702.11(1)(ii).